# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60018

JUAN M. HERRERA; SUSANA M. HERRERA,

Petitioners - Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee.

United States Court of Appeals
Fifth Circuit

**FILED**

November 11, 2013

Lyle W. Cayce
Clerk

Appeal from the Decision
of the United States Tax Court
TC No. 9481-10

Before REAVLEY, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:*

This is an appeal from a Tax Court decision sustaining a determination by the Commissioner of Internal Revenue ("Commissioner") that Appellants Dr. Juan and Susana Herrera improperly took a business bad debt deduction based upon payments Dr. Herrera's company made to satisfy the debt of another company he owned. Because the Herreras have not shown that Dr. Herrera's company was legally obligated to satisfy the debt, we AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-60018

I.

In 1978, Dr. Herrera, a mechanical and metallurgical engineer, and his colleague, Dr. Steve Stafford, formed an engineering consulting company called Met-Tech, Inc. ("MTI"). In 2000, MTI began to perform steel fabrication work in addition to its consulting business. By 2002, the steel fabrication work had grown to the point where Dr. Herrera and Dr. Stafford decided to form a second company. Accordingly, they spun off the consulting business into a newly-formed limited liability company, known as Herrera, Stafford & Associates ("HSA"), and continued their steel fabrication work through MTI. HSA elected to be treated as a partnership for tax purposes. Dr. Herrera initially owned fifty percent of the stock in MTI, but as of January 2007, he became owner of one-hundred percent of the company. Dr. Herrera also controlled most of HSA, owning approximately ninety-eight percent of that entity for all relevant tax years.

After the consulting business moved to HSA, MTI's steel fabrication work became unprofitable, requiring cash infusions from HSA and bank loans to survive. One of these transactions is the crux of this appeal: In August 2004, MTI and HSA jointly executed a promissory note for a $300,000 line of credit from Wells Fargo with a maturity date of August 15, 2005. Dr. Herrera signed the note on behalf of both companies. Although MTI and HSA were both obligors on the note, it is undisputed that MTI received all of the funds.

In June 2005, Wells Fargo renewed and increased the line of credit to $500,000, but this time only MTI was designated as the borrower. Dr. Herrera, along with two other individuals, personally guaranteed the note, but he did not do so on behalf of HSA. Ultimately, MTI was unable to pay off this renewed $500,000 line of credit, requiring an extension of the loan's maturity date to December 12, 2006.

2

No. 13-60018

When MTI did not meet the extended maturity date, HSA obtained its own $500,000 loan from Wells Fargo on January 18, 2007, and used almost all of the proceeds ($497,999.85) to pay off MTI's debt to Wells Fargo. HSA obtained this loan solely in its own name and authorized Wells Fargo to deduct loan payments from HSA's bank account through automatic debit transactions. HSA subsequently paid down this new loan with $90,200 in automatic debit charges and with a $100,000 check. HSA listed these two payments on its books as debts owed to it by MTI.

On its 2007 tax return, HSA claimed a business bad debt deduction for the two payments, which totaled $190,200. In addition to other bad debt deductions HSA took in relation to purported "loans" from HSA to MTI,[1] the Commissioner disagreed with HSA's treatment of the payments and determined that a bad debt deduction was not allowable. Accordingly, the Commissioner sent the Herreras a notice of deficiency asserting that they had underreported Dr. Herrera's share of pass-through income from HSA.

The Herreras petitioned the Tax Court for a redetermination of their income tax, contesting the disallowance of the bad debt deductions. The Commissioner responded that the bad debt deductions were not allowable for three reasons: (1) the transfers that HSA made to or on behalf of MTI did not constitute a bona fide debt; (2) the Herreras failed to show that the alleged debt became worthless in the tax year for which the deductions were claimed; and

---

[1] In total, HSA claimed bad debt deductions for 2006 and 2007 of $224,640 and $305,700, respectively, which included the $190,200 in payments on HSA's Wells Fargo loan. These other amounts, which are not at issue on appeal, included checks that HSA had written to MTI or on its behalf from July 2004 to September 2005. HSA characterized these payments as "loans." The Commissioner disagreed with the bad debt deductions associated with all of these purported "loans" and also assessed a late-filing penalty for the Herreras' 2007 filing. The Tax Court agreed with the Commissioner's position. On appeal, the Herreras do not challenge the Tax Court's decision with respect to these purported "loans" and only challenge the Tax Court's decision with respect to the $190,200 in payments on HSA's Wells Fargo loan.

No. 13-60018

(3) if there was a bona fide debt, it was deductible only as a short-term capital loss.

The Tax Court sustained the Commissioner's determination on the first ground and did not address the remaining two arguments. With respect to the purported "loans" HSA made directly to MTI, the Tax Court held that the business bad debt deductions were not allowable because the "loans" were not bona fide debt: there was no promissory note, bond, or indenture evidencing MTI's alleged indebtedness to HSA; there was no maturity date or repayment on the alleged loans; the debt was de facto subordinated to MTI's other debt; HSA did not require security or collateral; the source of repayment was tied to the fortunes of MTI's business; and HSA did not require MTI to pay interest on the purported loans. With respect the $190,200 HSA paid on its $500,000 Wells Fargo loan, the Tax Court determined that the payments did not give rise to a deduction because HSA was the borrower on the loan, not MTI. The Herreras timely appealed.

## II.

We apply the same standard of review to Tax Court decisions as we apply to district court determinations. *Rodriguez v. Comm'r*, 722 F.3d 306, 308 (5th Cir. 2013). Accordingly, we review issues of law *de novo* and issues of fact for clear error. *Terrell v. Comm'r*, 625 F.3d 254, 258 (5th Cir. 2010).

## III.

Section 166 of the Internal Revenue Code permits taxpayers to deduct from their gross income a business debt "which becomes worthless within the taxable year."[2] The Treasury Regulations construing § 166 further provide in relevant part:

---

[2] Section 166 also permits taxpayers to deduct non-business bad debts, but taxpayers must treat them as short-term capital losses. I.R.C. § 166(d)(1)(B). Short-term capital losses do not necessarily offset a taxpayer's ordinary income. *See* I.R.C. § 1211.

4

> [A] payment of principal or interest made during a taxable year beginning after December 31, 1975, by the taxpayer *in discharge of part or all of the taxpayer's obligation as a guarantor, endorser, or indemnitor* is treated as a business debt becoming worthless in the taxable year in which the payment is made . . . .

Treas. Reg. § 1.166–9(a) (emphasis added). Thus, as a general rule, where a taxpayer guarantees a loan in the course of his or her trade or business and subsequently must make payments to fulfill that guaranty, he or she may deduct those payments pursuant to § 166. *See Black Gold Energy Corp. v. Comm'r*, 99 T.C. 482, 488 (1992), *aff'd*, 33 F.3d 62 (10th Cir. 1994) (explaining that a guaranteed obligation is worthless when the guarantor pays the creditor).

This general rule is subject to an important qualification: the Treasury Regulations provide that a guaranty payment only qualifies for a bad debt deduction if "[t]here was an enforceable legal duty upon the taxpayer to make the payment." Treas. Reg. § 1.166–9(d)(2). Voluntary payments do not qualify. *See id.* § 1.166–1(c) ("A gift . . . shall not be considered a debt for purposes of section 166."); *see also Piggy Bank Stations, Inc. v. Comm'r*, 755 F.2d 450, 452–53 (5th Cir. 1985).

Here, the Tax Court determined that HSA's payments were not deductible because HSA made the payments on its own loan, not MTI's. On appeal, the Herreras argue that the Tax Court did not address the fact that HSA merely substituted its own note for MTI's and that therefore HSA's payments were in economic substance payments of MTI's debt. Furthermore, according to the Herreras, HSA was under a legal obligation to pay MTI's debt. They reason that HSA was a co-obligor on the original $300,000 line of credit, established in 2004, and that when Wells Fargo renewed and increased the line of credit to $500,000 in 2005, HSA remained liable. Accordingly, they

No. 13-60018

argue that when HSA agreed to substitute its own note for MTI's and subsequently paid down that debt, HSA was entitled to a bad debt deduction.

Although we agree with the Herreras' position that HSA's payments were effectively payments of MTI's debt, they have not shown that HSA was legally obligated to pay MTI's debt. Therefore, we agree with the Tax Court's ultimate conclusion that the payments did not give rise to a bad debt deduction.

The Herreras' argument ignores a critical difference between the original $300,000 line of credit and the renewed line of credit. It is true that HSA was a co-obligor along with MTI on the original $300,000 line of credit Wells Fargo extended in 2004. But when Wells Fargo renewed and increased the line of credit to $500,000, *only* MTI was designated as the borrower. Dr. Herrera personally guaranteed the renewed line of credit, but he did not do so on behalf of HSA. Indeed, the Herreras have not shown how HSA could have been held liable as a guarantor, endorser, indemnitor, or other secondary obligor for the renewed and increased line of credit when it did not sign—and was not even mentioned—in the applicable loan document. *See* Treas. Reg. § 1.166–9(a).

Moreover, the fact that HSA eventually obtained a loan from Wells Fargo in its own name to pay off MTI's debt does not change our conclusion. Dr. Herrera may have simply caused HSA to pay off MTI's debt because he was an individual guarantor and because Wells Fargo looked to him for repayment. But most importantly, the Herreras cite no authority showing that under these circumstances HSA's payment of MTI's debt was anything other than voluntary.[3] AFFIRMED.

---

[3] The Herreras cite several state-law cases describing the doctrine of equitable subrogation. They argue that under the doctrine of equitable subrogation, HSA acquired a legal claim against MTI when it paid down the line of credit. These cases are inapposite, as the issue here is whether HSA's payment of MTI's debt was voluntary or legally compelled, not whether, after having paid MTI's debt, HSA had a legal remedy against MTI.