T.C. Memo. 2014-70

UNITED STATES TAX COURT

ROBERT ALPERT, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16353-11.                    Filed April 17, 2014.

On his 2006 Form 1040, U.S. Individual Income Tax Return, P claimed a nonbusiness bad debt deduction of $1,904,987 resulting from his transfers of funds to two irrevocable trusts that he had established for the benefit of his two sons. He also deducted two losses totaling $3,795,082 resulting from an agreement to indemnify his mother for losses she suffered on account of certain unauthorized stock purchases P made on her behalf. R disallowed the deductions and determined an accuracy-related penalty.

<u>Held</u>: Nonbusiness bad debt deduction disallowed for failure to show (1) bona fide debts and (2) if bona fide debts, (a) that P was creditor and (b) if P was creditor, that debts were worthless.

<u>Held</u>, <u>further</u>, no indemnification agreement shown with respect to certain payments; other payments not made in course of trade or business; therefore, loss deduction disallowed.

<u>Held</u>, <u>further</u>, accuracy-related penalty sustained.

**[\*2]**   Yale F. Goldberg, Kacie N. Dillon, Tim A. Tarter, and Kirk A. McCarville, for petitioner.

Anne W. Durning and Michael R. Harrel, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  Respondent determined a deficiency of $1,787,148 in petitioner's 2006 Federal income tax along with an accuracy-related penalty of $357,430.[1]  The issues for decision are whether petitioner (1) is entitled to a claimed nonbusiness bad debt deduction, (2) is entitled to claimed loss deductions arising from an indemnification agreement with his mother, and (3) is liable for the penalty.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 2006, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts have been rounded to the nearest dollar.

---

[1]Respondent subsequently revised his determination and issued Form 3610, Audit Statement, and Form 5278, Statement--Income Tax Changes, reducing the deficiency to $768,588 and the penalty to $153,718.

**[*3]** Petitioner bears the burden of proof.[2]  See Rule 142(a).

FINDINGS OF FACT

Petitioner resided in Phoenix, Arizona, at the time he filed the petition.  He is a cash method, calendar year taxpayer.

Petitioner is a self-described entrepreneur and philanthropist.  Since the 1970s, petitioner has been involved in numerous business enterprises, including over 50 industrial startups.  Petitioner operates his businesses collectively under the name "The Alpert Companies", and he often uses a common set of offices and staff to handle the administrative, financial, accounting, and other responsibilities associated with his businesses.

Petitioner's Family

Petitioner's father died in June 1997.  Petitioner's mother, Gladys Alpert, lives in a condominium apartment in Florida owned by petitioner (condominium). Petitioner purchased the condominium from his parents in 1995, and he pays the real estate taxes, condominium association fees, and other expenses associated with the property.

---

[2]Petitioner has not raised the issue of sec. 7491(a), which shifts the burden of proof to the Commissioner in certain situations.  We conclude that sec. 7491(a) does not apply here because petitioner has not produced evidence that he has satisfied the preconditions for its application.

**[*4]**   Petitioner has two sons, Roman Merker Alpert, born in 1982, and Daniel James Alpert, born in 1989.

Petitioner's brother, Bruce Alpert, is disabled.  Petitioner paid his brother's living expenses from as early as 1999 until 2011, when their sister, Sandra Shulak, became Bruce's guardian.

The Trusts

In 1990, petitioner established two irrevocable trusts (collectively, trusts), one to benefit each of his sons:  the Roman Merker Alpert Trust (RAT) and the Daniel James Alpert Trust (DAT).  At that time, petitioner was involved in a variety of high-risk businesses, and he wanted to ensure that he set aside sufficient money for his sons' educations.

The trust agreements for the trusts were substantially the same.  Under the terms of each, the trustee was granted authority to appoint a successor trustee by written instrument.  In the event that a departing trustee failed to appoint a successor, the trustee position would by default pass to petitioner's sister, Ms. Shulak.  At all times since the formation of the trusts, the trustee of one trust has coincidently been the trustee of the other.

Each trustee has been a friend, relative, or employee of petitioner's.  The initial trustee was Dr. Lisa D. Santos, to whom petitioner was engaged twice

[*5] during the early 1990s. In April 1992, Dr. Santos resigned from her positions as trustee and appointed Dale Baker as her successor. Mr. Baker had had business dealings with petitioner since the early 1990s, and he would later serve as CEO in petitioner's aviation parts company. Mr. Baker resigned from his positions as trustee in February 1995, at which time he appointed Barbara Nussbaum, a close friend of petitioner's, as trustee.

Ms. Nussbaum resigned her positions as trustee on September 9, 1996. She did not at that time, however, appoint a successor trustee. At some point shortly after Ms. Nussbaum's resignation, petitioner, believing that he had the authority to appoint a successor trustee, purported to name Bill De Arman as trustee of the trusts. On August 1, 1997, Ms. Nussbaum signed a letter purporting to appoint Mark Riley, petitioner's in-house counsel, as trustee of both trusts, and Mr. Riley began acting as trustee at that time. Relations between petitioner and Mr. Riley soured, and petitioner terminated Mr. Riley from his in-house counsel position in October 1998. Following his termination as counsel, Mr. Riley continued to act as trustee of the trusts.

In April 1999, Ms. Shulak, citing the provision of the trust agreements designating her the successor trustee in the event that a departing trustee fails to name a successor, signed an acceptance of appointment asserting that she was

[*6] trustee as of September 9, 1996. Days later, Ms. Shulak resigned as trustee of both trusts and appointed Dennis Proctor as trustee. Mr. Proctor was another good friend of petitioner's. The validity of the various appointments following Ms. Nussbaum's resignation was among the issues in dispute in litigation involving Mr. Riley.

In 1996, petitioner established a third trust, the Robert Alpert 1996 Children's Trust (1996 trust), for the benefit of his sons.

Transfers To and From the Trusts

At some point before 1995, petitioner began transferring significant amounts of money to DAT and RAT. By January 1995, petitioner had transferred a net total of $188,796 each to DAT and RAT.

Between January 1995 and December 2000, petitioner transferred funds to DAT and RAT as follows:

[*7]

| Date | Amount transferred to DAT | Amount transferred to RAT |
|---|---|---|
| Jan. 11, 1995 | $600,072 | $600,072 |
| Nov. 22, 1995 | 37,868 | 37,338 |
| Feb. 14, 1996 | 59,821 | n/a |
| Feb. 15, 1996 | n/a | 59,821 |
| July 29, 1996 | 1,004,375 | 1,004,375 |
| Aug. 2, 1996 | 275,000 | 275,000 |
| Aug. 16, 1996 | 426,563 | 425,000 |
| Sept. 25, 1996 | 255,000 | 255,000 |
| Nov. 14, 1996 | 41,093 | 41,093 |
| Dec. 19, 1996 | 115,000 | 115,000 |
| Mar. 21, 1997 | 55,000 | 230,000 |
| Mar. 24, 1997 | 145,000 | 145,000 |
| Mar. 26, 1997 | 15,000 | 15,000 |
| Mar. 31, 1997 | 30,000 | 30,000 |
| Apr. 7, 1997 | 25,000 | 60,000 |
| Apr. 16, 1997 | 70,000 | 80,000 |
| July 31, 1997 | 260,000 | 260,000 |
| Aug. 5, 1997 | 780,000 | 776,000 |
| Apr. 15, 1998 | 68,088 | 69,858 |
| Oct. 13, 1998 | 6,866 | 3,489 |
| Nov. 16, 1998 | 133,620 | 133,584 |
| Dec. 29, 1998 | 158 | 80 |
| Dec. 30, 1998 | 10,000 | 10,000 |
| Apr. 15, 1999 | 1,600 | 1,600 |
| Total | 4,415,124 | 4,627,310 |

[*8]   During that same period, the trusts transferred funds to petitioner as follows:

| Date | Amount transferred by DAT | Amount transferred by RAT |
|---|---|---|
| Oct. 25, 1995 | $329,600 | $329,600 |
| Dec. 31, 1995 | 12,500 | 12,500 |
| Jan. 11, 1996 | 849 | 849 |
| Feb. 5, 1996 | 12,500 | 12,500 |
| Mar. 4, 1996 | 12,500 | 12,500 |
| Apr. 30, 1996 | 12,500 | 12,500 |
| May 28, 1996 | 300,000 | 300,000 |
| June 14, 1996 | 12,500 | 12,500 |
| July 17, 1996 | 90,000 | 90,000 |
| Aug. 1, 1996 | 12,500 | 12,500 |
| Aug. 20, 1996 | 800,000 | 800,000 |
| Sept. 6, 1996 | 12,500 | 12,500 |
| Nov. 26, 1996 | 400,000 | 400,000 |
| Dec. 24, 1996 | 80,000 | 80,000 |
| June 4, 1997 | 500,000 | 700,000 |
| July 22, 1997 | 250,000 | 250,000 |
| July 24, 1997 | 100,000 | 100,000 |
| Aug. 15, 1997 | 100,000 | n/a |
| Sept. 18, 1997 | 740,000 | 800,000 |
| Dec. 12, 1997 | 1,000 | 1,000 |
| Dec. 31, 1997 | 10,000 | 10,000 |
| Apr. 23, 1999 | 700 | 700 |
| July 1, 1999 | 9,151 | 9,152 |
| Nov. 22, 1999 | 550 | 550 |
| Dec. 31, 1999 | n/a | 9,151 |
| Dec. 6, 2000 | 190 | 190 |
| Total | 3,799,540 | 3,968,692 |

**[*9]**   After December 31, 2000, petitioner continued to transfer funds to or on behalf of DAT and RAT.  Between 2002 and 2006, petitioner transferred more than $300,000 to each of the trusts for legal fees and related expenses.  Petitioner continued to expend funds on behalf of the trusts up to the date of the trial in this case, and he testified that he anticipated that he would continue to do so.  In 2004, petitioner transferred $444,500 to DAT to purchase a house in which Daniel would live.

The Promissory Notes

In January 1995, petitioner and Mr. Baker, as trustee for RAT, prepared a promissory note dated January 6, 1995, claiming to document a loan from petitioner to RAT of $188,796, payable on or before January 6, 1996.  That note was never executed, and petitioner's records indicate that no transfer of funds occurred on that day.

Petitioner and Mr. Baker prepared another promissory note, dated January 11, 1995, documenting a loan from petitioner to RAT of $600,072, payable on or before January 6, 1996.  That note was not executed, though petitioner did transfer that amount of funds to RAT.

A year later, on January 11, 1996, Ms. Nussbaum, as trustee for DAT, signed a promissory note claiming to document a loan from petitioner to DAT.

**[*10]** The note called for a loan of $517,788, with interest accruing at 6% annually, the balance due on or before January 11, 1997. By the terms of the note, the loan was collateralized by 9,500 shares of Telephones de Mexico S.A. de C.V. (Telmex) common stock and 25,000 shares of U.S. Delivery Systems, Inc. common stock. On July 6, 1996, Ms. Nussbaum sold the 9,500 shares of Telmex common stock, and on August 13, 1997, she sold 60,000 shares of Corporate Express, Inc., formerly U.S. Delivery Systems, Inc.

Also on January 11, 1996, Ms. Nussbaum, as trustee for RAT, signed a similar note, providing for a loan from petitioner to RAT of $517,255, and bearing the same interest rate, payment terms, and collateral as the DAT note. The collateral was similarly sold.

No funds were actually transferred to either DAT or RAT in connection with the 1996 promissory notes. Rather, the amounts stated as transferred approximated the net funds petitioner had previously advanced to each trust as of January 11, 1996.

The Riley Litigation

In 1999, Mr. Riley, acting as trustee on behalf of DAT and RAT, filed a lawsuit against petitioner in the Harris County, Texas Probate Court (probate court). Among other allegations, the complaint alleges that Mr. Riley was the

**[*11]** proper trustee of the trusts, that petitioner had interfered with Mr. Riley's carrying out his duties as trustee, that the loans at issue in the present case were, in reality, gifts, and that petitioner had breached certain fiduciary duties he allegedly owed to the beneficiaries of the trusts. Petitioner denied those allegations.

In the years that followed, litigation over the trusts continued between Mr. Riley and petitioner in both the probate court and in the U.S. District Court for the Southern District of Texas. During an April 2005 deposition in connection with the Riley litigation, petitioner testified that he had assigned the debts to the 1996 trust in the spring of 1999 or 2000 in order to satisfy obligations he owed to the 1996 trust. The probate court litigation ultimately went to trial and, in March 2006, the probate court entered judgments in favor of Mr. Riley. Among its holdings, the probate court found that Mr. Riley was properly the trustee of DAT and RAT, and it issued judgments for damages against petitioner in favor of the trusts. Petitioner appealed the decision, and in July 2006, the judgments were stayed pending appeal. On appeal, the Court of Appeals of Texas reversed the judgments against petitioner, reversed the decision affirming Mr. Riley as trustee, and remanded the case to probate court to resolve certain issues. In 2010, the probate court entered final judgments in favor of DAT and RAT and against Mr. Riley, awarding DAT and RAT damages, interest, and attorney's fees against Mr.

[*12] Riley.  A second appeal followed, which resulted in yet again a remand for further proceedings.  A 2012 memorandum opinion of the Court of Appeals of Texas summarizes the then-foregoing litigation.  Riley v. Alpert, No. 01-11-00430-CV, 2012 WL 3042991 (Tex. App. July 26, 2012).

The Trusts' Assets

Following the probate court's initial judgment against petitioner in 2006, Mr. Riley caused DAT and RAT to disburse a total of $245,927 and $307,988, respectively, to various third parties.

In April 2007, Mr. Riley's attorney provided an accounting of the trusts' assets, as of December 31, 2006, to petitioner's attorney.  According to the accounting, as of December 31, 2006, DAT owned assets totaling $3,232,026, consisting of $269,672 in cash, investments totaling $51,925, receivables of $150,000 from the 1996 trust, and the value of the judgment against petitioner (plus interest) of $2,760,429.  Mr. Riley's attorney valued RAT's total assets, as of December 31, 2006, at $3,293,377, consisting of $293,599 in cash, investments totaling $39,641, receivables from DAT and the 1996 trust of $24,854 and $174,854, respectively, and the value of the judgment against petitioner (plus interest) of $2,760,429.

[*13] <u>Aviation Sales Co.</u>

Petitioner was the founder and senior board member of Aviation Sales Co. (AVS),[3] a company publicly traded on the New York Stock Exchange beginning in 1996. In 1996, petitioner's parents purchased 25,000 shares of AVS during the company's initial public offering. After the death of petitioner's father in 1997, petitioner had trading authority over his mother's brokerage accounts. Between 1998 and 1999, Mrs. Alpert acquired tens of thousands of shares of AVS, and by the end of 1999, Mrs. Alpert owned approximately 86,000 shares of AVS stock. It is unclear from the record whether petitioner or Mrs. Alpert authorized those purchases.

With the exception of approximately 15,000 shares she acquired in May 1999, Mrs. Alpert sold all of those shares in 2001. On her 2001 Federal income tax return, Mrs. Alpert reported a loss on the sale of those shares of $1,941,317.

During May and June 2000, petitioner, acting without his mother's knowledge, purchased for her (in her brokerage account) an additional 289,500

---

[3]Certain documents in the record refer to "Timco Aviation Services, Inc.," the name of the successor to AVS, following a major reorganization in 2001-02. For clarity, we will use the term "AVS" to refer to shares of the company both before and after the name change.

[*14] AVS shares, at a cost of $1,969,711.[4]  The share price of AVS declined precipitously in the months that followed, and when Mrs. Alpert learned of petitioner's purchases in early 2001, she was upset that he had depleted her assets and threatened to sue him for engaging in the unauthorized purchases.

In June 2001, petitioner orally promised his mother that he would cover any losses she incurred if her AVS shares were sold at a loss.  In exchange, she agreed that he would share in half of any profits if the shares were sold at a gain.  Those promises were memorialized in a letter dated January 14, 2002, from petitioner to his mother.  In the letter petitioner admits that, "in an effort to support the falling stock price of * * * [AVS], I caused your brokerage account to purchase * * * [289,500] AVS shares in May and June of 2000."  In pertinent part, he continues:

> In June 2001, I orally agreed to indemnify you and your estate for any losses that you would suffer from my actions, and you agreed to share equally any gains in excess of the purchase price * * * once the shares were sold.
>
> In the fourth quarter of 2001, you indicated that you were quite upset that I caused these purchases without advising you, and that it depleted the overwhelming majority of your net worth. * * * You indicated that your friends and advisors have suggested that you file a

---

[4]In his correspondence with both Mrs. Alpert and the Internal Revenue Service, petitioner claims to have purchased 330,400 shares in 2000.  A review of Mrs. Alpert's account statements, however, shows that two transactions involving a total of 40,900 shares were canceled.  The correct number of AVS shares acquired during that period, then, was 289,500.

**[*15]** lawsuit against me for undertaking the unauthorized purchase of AVS shares as part of my efforts to support the stock.  I am documenting our oral agreement consistent with my commitment to you to indemnify you for any losses of principal that you have or will suffer.  * * * I agree to the following:

1. On your behalf in service of my indemnification, I will pay all expenses related to your condominium lease.
2. I will pay all expenses related to care, maintenance, and the remodeling of the condominium that you are contemplating.
3. As part of this obligation, I have paid margin amounts on your brokerage accounts
4. I will pay your income tax, and your professional tax preparation fees.
5. I will fund your personal cash requirements in your sole discretion, subject to my availability of cash not to exceed $250,000 per year.
6. I will pay the expenses and purchases you direct me to pay on behalf of Bruce Alpert.

  *     *     *     *     *     *     *

I am sorry I invested so much of your capital irresponsibly to support AVS, and most importantly, I am sorry for the discomfort I have caused you.  * * *

In 2006, Mrs. Alpert sold her remaining AVS shares at a loss of $2,575,655.

Of that loss, $610,192 was attributable to shares purchased in 1999, while the

remaining $1,965,463 was attributable to shares purchased in 2000.

Upon the sale of Mrs. Alpert's AVS shares, petitioner's office sent Mrs.

Alpert a series of letters informing her that petitioner had fulfilled his obligation to

[*16] indemnify her for her losses. The letters asserted that petitioner's payment of Mrs. Alpert's and Bruce Alpert's living expenses sufficiently covered Mrs. Alpert's losses on AVS stock sold in 2001 and 2006. That determination was based on a list of expenditures, compiled by petitioner's employees, detailing expenses paid by petitioner for the benefit of Mrs. Alpert and Bruce Alpert. The list included expenses paid as early as 1999, and included costs incurred in connection with the condominium, including quarterly maintenance fees, annual property taxes, special assessments, insurance, and kitchen remodeling. After 2006, petitioner continued to pay both the expenses associated with the condominium and Bruce Alpert's living expenses.

Petitioner's 2006 Tax Return

Petitioner filed a Form 1040, U.S. Individual Income Tax Return, for 2006 in October 2007. Petitioner's 2006 Form 1040 was prepared by Allison Elliott of Perkins & Company, P.C., an accounting firm based in Portland, Oregon, who received petitioner's financial records from his bookkeepers. On a Schedule D, Capital Gains and Losses, attached to his 2006 Form 1040, petitioner reported among other items a short-term capital loss of $1,904,987. That loss reflected a nonbusiness bad debt deduction on account of worthless debts owed him by DAT and RAT. He also reported two short-term capital losses similarly identified as

**[*17]** "Indemnification Payment to G. Alpert:  Loss on Timco St" of $2,500,000 and $1,295,082 ($3,795,082, in total).

Petitioner's Previous Returns

On a Schedule E, Supplemental Income and Loss, attached to each of petitioner's 2000, 2001, 2002, 2004, and 2005 Forms 1040, he reported the condominium as a rental property.  For each year, he reported no rental income from the condominium but claimed a loss based on expenses for mortgage interest, taxes, and depreciation.  For each of those years, petitioner checked "no" in box 2 (on Schedule E), which asks:  "For each rental real estate property listed on line 1, did you or your family use it during the tax year for personal purposes for more than the greater of 14 days or 10% of the total days rented at fair rental value?"

On Schedule D, attached to petitioner's 2001 Form 1040, he reported a short-term capital loss for "Indemnification AVS Loss - Gladys" of $163,962.  On Schedule D, attached to his 2005 Form 1040, he reported a short-term capital loss for "G Alpert Indemnification" of $59,433.

Examination and Petition

Respondent's examination of petitioner's 2006 return followed, and petitioner timely petitioned the Court to redetermine the deficiency and penalty determined by respondent.

**[*18]**                                    OPINION

I.     Introduction

On his 2006 Form 1040, petitioner claimed a nonbusiness bad debt deduction of $1,904,987, resulting from funds he transferred to the trusts. He also claimed a deduction for two losses totaling $3,795,082, resulting from an agreement to indemnify his mother for losses she had suffered on account of certain unauthorized stock purchases he made on her behalf.

We note at the outset that the transactions in question must be viewed in the light of the fact that many of the parties to these transactions with petitioner are related to him or are under his control. Petitioner, the maker of the claimed loans, was the settlor of the trusts to which the transfers were made; the trustees at the time of the various transfers were petitioner's friends, close acquaintances, employees, or business partners, and the beneficiaries of the trusts were petitioner's sons. The indemnification losses are based on an agreement between petitioner and his mother. Accordingly, we subject the transactions to careful scrutiny. See, e.g., Clark v. Commissioner, 18 T.C. 780, 783 (1952) ("[I]ntra-family transactions are subject to rigid scrutiny[.]"), aff'd, 205 F.2d 353 (2d Cir. 1953); see also Goldstein v. Commissioner, T.C. Memo. 1980-273, 1980 WL 4118

[*19] (applying heightened scrutiny to determine validity of loans between taxpayers and trusts established for benefit of taxpayers' children).

## II. Bad Debt Deduction

### A. Introduction

On brief, petitioner increases the amount that, in 2006, he claims he suffered as a bad debt on account of his claimed loans to DAT and RAT. Petitioner increases his claim from the $1,904,987 shown on his return to $1,982,209.

Section 166 allows a deduction for bad debts. In the case of an individual, nonbusiness bad debts that become worthless during the year may be deducted, but only as short-term capital losses. See sec. 166(d)(1). "To qualify for a deduction for a worthless debt a taxpayer must show that he and his alleged debtor intended to create a debtor-creditor relationship, that a genuine debt in fact existed, and that the debt became worthless within the tax year." Andrew v. Commissioner, 54 T.C. 239, 244-245 (1970); see also sec. 1.166-1(c), Income Tax Regs.

Respondent argues that petitioner is not entitled to the deduction because (1) petitioner has not established that the transfers were bona fide debts and (2) even if the transfers were bona fide debts, petitioner has not established (a) that he

[*20] was the debt holder in 2006 and (b) even if he was, that the debts became worthless during 2006.

B.    Bona Fide Debt

Respondent does not dispute that the claimed transfers between petitioner and DAT or RAT actually took place.  He disagrees, however, with petitioner's characterization of those transfers as loans.  The regulations make clear:  "Only a bona fide debt qualifies for purposes of section 166.  A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money."  Sec. 1.166-1(c), Income Tax Regs.  As we have said:  "The taxpayer must show that there existed at the time of the transaction a real expectation of repayment and an intent to enforce collection of the indebtedness."  Andrew v. Commissioner, 54 T.C. at 245.  "Whether a bona fide debtor-creditor relationship exists is a question of fact to be determined upon a consideration of all the pertinent facts in the case."  Fisher v. Commissioner, 54 T.C. 905, 909 (1970).  Factors indicative of a bona fide debt include whether:  (1) evidence of indebtedness exists; (2) any security is requested; (3) there has been a demand for repayment; (4) the parties' records reflect the transaction as a loan; (5) any payments have been made; and (6) any interest was charged.  See, e.g., Sundby v. Commissioner, T.C. Memo. 2003-204,

**[*21]** 2003 WL 21638265, at *3. In summary, the key question is: "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973); see also Herrera v. Commissioner, T.C. Memo. 2012-308, at *14, aff'd, 544 Fed. Appx. 592 (5th Cir. 2013).

On the basis of the evidence before the Court, we cannot conclude that the transfers were bona fide loans. The claimed loans are evidenced by only two promissory notes executed by the then trustee, Ms. Nussbaum, in 1996, of $517,788 (DAT) and $517,255 (RAT). Petitioner's records show, however, that no actual transfers of funds occurred in conjunction with those notes. Rather, the notes merely reflected cumulative funds petitioner had transferred to the trusts as of the date of the notes. Moreover, the execution of a note does not necessarily establish the existence of a bona fide debt. Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), aff'd, 192 F.2d 391 (2d Cir. 1951) (per curiam).

No notes or other documentation was issued with respect to petitioner's post-January 11, 1996, transfers to the trusts. Petitioner claims those transfers, which total $3,777,184 to DAT and $3,989,900 to RAT, were authorized under a revolving line of credit he extended to the trustee of the two trusts. Neither

[*22] petitioner, his employees, nor the trustees created documents in support of the purported line of credit. We are thus unable to determine what the repayment terms may have been, what (if any) interest was charged, whether the loans were secured, or any other details that would aid our analysis. The absence of provisions for security, interest, and a fixed repayment date weigh against finding a bona fide loan. See Hubert Enters., Inc. v. Commissioner, 125 T.C. 72, 94-97 (2005), aff'd in part, rev'd in part on another issue and remanded, 230 Fed. Appx. 526 (6th Cir. 2007); Estate of Rosen v. Commissioner, T.C. Memo. 2006-115, 2006 WL 1517618, at *22-*24.

Petitioner's records indicate that the trusts did not follow any specific repayment schedule. Despite having received millions of dollars from petitioner, both trusts failed to make a single payment in 1998; in 1999, RAT made four payments, totaling $19,553, while DAT made only three payments, totaling $10,401; and in 2000, the trusts made one payment each, both in the amount of $190. When the trusts failed to pay, however, petitioner did not make demand for repayment, accelerate payment (which would have been permitted under the January 1996 notes), or take legal action against the trusts. Nor, during the same period, did the trustee seek a postponement from petitioner. Such conduct weighs against a finding of a bona fide debt. See, e.g., Davidson v. Commissioner, T.C.

**[*23]** Memo. 1978-167 (failure to institute legal action to collect is factor indicative of gift rather than loan).

Given that the beneficiaries of the trusts were the natural objects of petitioner's affection, the lack of any written agreement with respect to the majority of the transfers, and the lack of any evident plan of repayment, we cannot conclude that the transfers from petitioner to the trusts represented bona fide loans. Accordingly, petitioner may not claim a section 166(d) nonbusiness bad debt deduction. For the sake of completeness, we will continue and address respondent's alternative arguments in support of his disallowance of any bad debt deduction.

C.    Assignment of Loans

Even if we were to find that the transfers in question represented bona fide indebtedness, petitioner has failed to establish that he was the creditor in 2006. In order to claim a bad debt deduction, the taxpayer must be the creditor on the loan for which the deduction is claimed. See, e.g., Anderson v. Commissioner, 5 T.C. 482, 488 (1945) ("A taxpayer is not entitled to deduct from gross income any part of a worthless debt to some one other than the taxpayer."), aff'd, 156 F.2d 591 (2d Cir. 1946); see also sec. 1.166-1(a), Income Tax Regs. ("Section 166 provides that

**[*24]** * * * a deduction shall be allowed in respect of bad debts owed to the taxpayer.").

As we have found, during an April 2005 deposition in connection with the Riley litigation petitioner testified that he had assigned the debts to the 1996 trust in the spring of 1999 or 2000 in order to satisfy obligations he owed to the 1996 trust. At trial, petitioner did not deny that he had assigned the debts, but he testified that the assignment "was reversed" shortly after the deposition because the validity of the loans had been challenged in the Riley litigation. He continued that, in substitution, he satisfied his obligation to the 1996 trust with his own note to that trust. Petitioner produced no documents evidencing either the assignment or the reversal and substitution. Bobbie Bayless, an attorney who represented petitioner during the probate court litigation, testified that she was not aware that any assignment had ever occurred. Taking petitioner at his word that, in 1999 or 2000, he assigned the debts to the 1996 trust, but considering the lack of evidence corroborating his testimony that the assignment was undone, we cannot conclude that petitioner has proved that he was the owner of any indebtedness from the trusts (if there was any) in 2006.

[*25] D.    Worthlessness

Petitioner has likewise failed to show that the debts (if there were debts) became wholly worthless in 2006.  As stated supra, an individual's nonbusiness bad debts may be deducted only as short-term capital losses for the year in which they become wholly worthless.  "The year a debt becomes worthless is fixed by identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery."  Aston v. Commissioner, 109 T.C. 400, 415 (1997).

The question of whether a debt actually becomes worthless during a taxable year is to be determined on the basis of all the facts and circumstances.  See, e.g., Halliburton Co. v. Commissioner, 93 T.C. 758, 774 (1989), aff'd, 946 F.2d 395 (5th Cir. 1991).  "Specifically, * * * [a taxpayer] must prove that the debt had value at the beginning of the taxable year and that it became worthless during that year."  Milenbach v. Commissioner, 106 T.C. 184, 204 (1996), aff'd in part, rev'd in part on other grounds, 318 F.3d 924 (9th Cir. 2003).  The taxpayer "must show sufficient objective facts from which worthlessness could be concluded; mere belief of worthlessness is not sufficient."  Fincher v. Commissioner, 105 T.C. 126, 138 (1995).

Among the facts and circumstances considered by courts to determine whether a debt is worthless are the debtor's earning capacity, the solvency of the

[*26] debtor, the debtor's refusal to pay, actions of the creditor in pursuing collection, subsequent dealings between the creditor and debtor, and the debtor's lack of assets. Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 594 (1991). No single factor is conclusive. Id. at 595. Legal action is not required to show worthlessness if surrounding circumstances indicate that a debt is worthless and uncollectible and that any legal action in all likelihood would be futile because the debtor would not be able to satisfy a favorable judgment. Sec. 1.166-2(b), Income Tax Regs.

Petitioner claims that the purported loans to DAT and RAT became worthless following the entry of final judgment in favor of Riley in the probate court case and "the consequences that flowed from it." Specifically, petitioner argues that, after the probate court reappointed Mr. Riley as trustee, Mr. Riley depleted the assets in the trusts by "disburs[ing] hundreds of thousands of dollars for unauthorized and/or personal matters" and refused to provide petitioner or his sons with an accounting of the trusts' assets. These actions, according to petitioner, gave rise to the conclusion that there was no hope of recovering any of the outstanding debts.

The evidence does not support petitioner's conclusion. Neither DAT nor RAT became insolvent during 2006. While the evidence does show that,

**[*27]** following entry of judgment in the probate court case, Mr. Riley disbursed funds totaling $245,927 and $307,988 from bank accounts held by DAT and RAT, respectively, those disbursements did not represent the totals of the trusts' assets. Statements for those accounts indicate that, on December 29, 2006, DAT had a cash balance of $215,520 and RAT had a cash balance of $281,690.

Further, according to the accounting provided by Mr. Riley's counsel to Ms. Bayless on April 12, 2007 (a full six months before petitioner filed his 2006 return), both trusts held significant assets on December 31, 2006. In addition to the bank accounts, each trust held investments and receivables worth over $150,000. The accounting for each trust also shows a judgment against petitioner of $2,760,429 (including interest), against which petitioner could have offset the debts owed to him. Not listed on the accounting was Daniel's house, which DAT purchased with a $444,500 transfer from petitioner in 2004.

Nor does the adverse judgment in the Riley litigation, according to which Mr. Riley was found to be the proper trustee of DAT and RAT, support petitioner's claim that there was no longer any prospect of recovery. After the entry of judgment in the probate court case, petitioner continued to advance funds to the trusts in pursuit of litigation against Mr. Riley and other parties involved in the

[*28] trust litigation.[5]  He also appealed the judgment of the probate court, ultimately resulting in Mr. Riley's removal as trustee and the appointment of petitioner's long-time employee Linda Stanley, a trustee arguably more amenable to repaying the loans.

Petitioner claims on brief that his continued financing of the trusts' legal fees was merely "striking 'a middle course between optimism and pessimism'", and should not be interpreted as evidence that a reasonable prospect of recovery existed.  "Given the significant amount owed," petitioner contends, "it was petitioner's sound business judgment to nonetheless protect his interests, notwithstanding the existence of facts * * * that rendered the debts worthless almost beyond peradventure."  Petitioner's argument is unbelievable on its face. We do not find it credible that petitioner would have advanced tens of thousands of dollars to fund years of litigation if he believed the debts had been rendered worthless.  More importantly, the proper inquiry in this case is not whether petitioner acted reasonably in his recovery efforts, but whether sufficient objective facts show that the debt became worthless during the year in question.  Here, the facts do not support such a determination.

---

[5]That litigation apparently continues today.  See Riley v. Alpert, No. 01-11-00430-CV, 2012 WL 3042991 (Tex. App. July 26, 2012).

[*29] The evidence shows that both DAT and RAT held substantial assets at the conclusion of the tax year. Petitioner's pursuit of further litigation, both in 2006 and beyond, and, to this point, his qualified success on appeal, indicate that a reasonable prospect of recovery existed in 2006.

Petitioner has failed to satisfy his burden of showing that the debts became wholly worthless in 2006. Accordingly, respondent's disallowance of the deduction is sustained on that ground.

III.    Indemnification Agreement

A.    Introduction

Section 165(a) allows a deduction for losses sustained within the taxable year and not compensated for by insurance. In the case of an individual, the losses deductible under section 165(a) are limited to (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. Sec. 165(c).

Petitioner alleges that he entered into an oral agreement with his parents to indemnify them against losses that they might sustain on their purchase of AVS stock. According to petitioner, under the terms of that agreement, if the stock

[*30] declined and was sold at a loss, petitioner would reimburse his parents for that loss and, in consideration for that indemnification, petitioner would be entitled to receive one half of any gains, should the stock be sold for a profit. In 2001, Mrs. Alpert incurred a loss of $1,941,317 on the sale of AVS shares acquired between 1996 and 1999. In 2006, Mrs. Alpert sold her remaining AVS shares at a loss of $2,575,655, of which $610,192 was attributable to shares acquired before 2000, and $1,965,463 was attributable to shares acquired in May or June 2000.

On his 2006 Schedule D, petitioner claimed short-term capital losses of $1,295,082 and $2,500,000 in connection with the purported indemnification agreement. Petitioner argues that expenses he paid on behalf of his mother and brother between 2000 and 2006 were paid in fulfillment of the purported agreement and entitle him to deduct those expenses as trade or business losses on his 2006 tax return. Petitioner does not argue that, and we do not consider whether, the expenses were incurred in connection with a nonbusiness transaction entered into for profit and are, for that reason, deductible under section 165(c)(2). We consider only petitioner's argument that he is entitled to deduct a trade or business loss.

[*31] As discussed in greater detail below, petitioner's interpretation of the facts is unsupported by credible evidence. Petitioner has failed to show that he promised to indemnify Mrs. Alpert for any losses on any stock purchased before May 2000. With respect to petitioner's agreement to indemnify Mrs. Alpert for losses on the year 2000 unauthorized stock purchases, petitioner has failed to show that the losses were incurred in connection with a trade or business. Accordingly, we sustain respondent's disallowance of the deductions.[6]

B.    Whether an Indemnification Agreement Exists With Respect to AVS Shares Purchased Before 2000

At trial and on brief, petitioner claimed (or claims) that he and his father orally entered into the indemnification agreement regarding the purchase of AVS stock during the company's initial public offering and that that agreement also extended to all subsequent purchases by his parents of AVS stock, including the stock he caused Mrs. Albert to acquire in 2000. Petitioner has offered no other evidence or documentation to support his testimony regarding the pre-2000 AVS purchases, and we do not find that testimony credible.

---

[6] Because petitioner's failure to establish that the losses were incurred in connection with a trade or business is sufficient ground to deny the deductions in their entirety, we need not address the issues of timing, the accuracy of petitioner's claimed expenditures, or petitioner's continued payment of his mother's and brother's living expenses after satisfying his claimed obligations.

[*32] There is, of course, evidence besides petitioner's testimony of his promise to indemnify his mother against losses on the AVS shares he purchased for her in 2000. In the January 14 letter, petitioner apologized to his mother for having undertaken the May and June purchases and promised to indemnify her for any losses she sustained in connection with those purchases. Petitioner now claims that he sent that letter merely to reaffirm an ongoing agreement he entered into with his parents at the time of AVS' initial public offering. In the letter, however, petitioner asserts that he orally agreed in June 2001 to indemnify her for any losses, and there is no reference to any earlier agreement. The letter contains no reference to any purchase of AVS shares before 2000, and no mention whatsoever of a preexisting indemnification agreement between petitioner and either of his parents. Given that Mrs. Alpert was threatening legal action against petitioner at the time he wrote the January 14 letter, surely petitioner would have made some mention of a preexisting agreement in that letter. His failure to do so suggests that such an agreement did not exist. Similarly, during respondent's examination of petitioner's 2006 return, petitioner's counsel represented in a letter to respondent's Appeals officer that, "in consideration of resolving the unauthorized purchase" (emphasis added), petitioner "agreed to indemnify Mrs. Alpert from any losses

[*33] incurred by way of the stock purchase". No mention is made of any prior share purchases or preexisting agreement.

Petitioner's attempt to recast the facts to show an indemnification agreement before 2001 is not supported by any credible evidence. Petitioner has not demonstrated the existence of an indemnification agreement with respect to the AVS shares purchased before May 2000. Thus, he is not entitled to claim a section 165 deduction in connection with losses incurred on Mrs. Alpert's sale of those shares ($1,295,082 attributable to the 2001 sales and $610,192 attributable to the 2006 sales).

C.    Losses Not Incurred in Connection With Petitioner's Trade or Business

With respect to the loss sustained in connection with Mrs. Alpert's sale in 2006 of the AVS shares purchased in 2000, petitioner is not entitled to a section 165(c)(1) deduction because he has not shown that the loss was incurred in connection with his trade or business. To be engaged in a trade or business, an individual must be involved in an activity with continuity and regularity, and the primary purpose for engaging in the activity must be for income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); see also Sandoval v. Commissioner, T.C. Memo. 2010-208, 2010 WL 3719257, at *3.

[*34] Petitioner contends that he is entitled to a deduction under section 165(c)(1) because his trade or business involves "acquiring majority ownership positions in distressed companies, improving their operations and profitability, [and] taking them public * * *. In so doing, petitioner seeks out and enlists other investors * * * for the purpose of acquiring these companies. This indemnification agreement with his parents was no different."

Petitioner's assertion that the indemnification agreement is part of his trade or business is premised on his attempt to recharacterize his 2001 oral and 2002 written promises to his mother as aspects of an agreement between himself and both of his parents dating back to 1996. As discussed above, we reject petitioner's interpretation of events as lacking in credibility and unsupported by the evidence. While it may be true that petitioner is engaged in the business of improving the operations of distressed companies, the indemnification agreement and the losses stemming therefrom were not incurred in that business.

The record in this case shows that petitioner orally promised to indemnify Mrs. Alpert for any losses no earlier than June 2001, a promise he recorded in his January 14, 2002, letter to his mother. It is clear from that letter that petitioner entered into the agreement not in the course of his business or as a profit-making endeavor, but to protect himself from personal liability after his imprudent and

**[\*35]** unauthorized investment of his mother's money in 2000.  Petitioner has not demonstrated that his efforts to protect himself from liability for engaging in these transactions was part of his trade or business.  Nor can it be said that petitioner's management of his mother's assets constituted part of his trade or business.  Following his father's death, petitioner had authority to invest the assets of his father's estate for the benefit of his mother; he had as well access to his mother's investment accounts.  Petitioner has not offered any evidence that his management of his mother's financial affairs constituted part of his trade or business, that he received compensation for doing so, or that he acted in any capacity other than that of a supposedly dutiful son.  Put a different way, the origin of petitioner's loss was rooted in his personal relationship with his mother and his breach of the trust inherent in that relationship, which resulted from his unauthorized stock purchases.  We believe that it was to repair that rent in his relationship with his mother (and perhaps to avoid criminal liability) that he agreed to indemnify his mother; it was not to make good on the terms of some preexisting joint-venture agreement.  Cf. United States v. Gilmore, 372 U.S. 39 (1963).

Because petitioner has failed to demonstrate that he entered into the indemnification agreement as part of his trade or business, he may not claim a

[*36] section 165(c)(1) deduction for the losses he incurred in connection with that agreement.  Therefore, we sustain respondent's disallowance of the loss deduction.

IV.    Section 6662(a) Penalty

Section 6662(a) and (b)(1) and (2) provides for an accuracy-related penalty of 20% of the portion of any underpayment attributable to, among other things, negligence or intentional disregard of rules or regulations (without distinction, negligence) or any substantial understatement of income tax.  The term "negligence" includes "any failure to make a reasonable attempt to comply with the provisions" of the Code or to exercise "ordinary and reasonable care in the preparation of a tax return."  See sec. 1.6662-3(b)(1), Income Tax Regs.  The term "disregard" includes "any careless, reckless, or intentional disregard."  Sec. 6662(c).

A substantial understatement of income tax exists for an individual if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  See sec. 6662(d)(1)(A).

Respondent bears the burden of production with respect to the penalty, see sec. 7491(c), and petitioner concedes that respondent has met his burden.  Therefore, unless petitioner shows that he is entitled to relief under section

**[*37]** 6664(c)(1), the penalty shall apply.  See Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

Section 6664(c)(1) provides that the penalty shall not be imposed with respect to any portion of an underpayment if the taxpayer shows that there was reasonable cause for, and that he acted in good faith with respect to, that portion.

> The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances.  * * *  Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer.  * * *  [Sec. 1.6664-4(b)(1), Income Tax Regs.]

Reliance on the advice of a professional tax adviser does not necessarily demonstrate reasonable cause and good faith.  See id.  Rather, reasonable cause will be found where the taxpayer selects a competent tax adviser, supplies the adviser with all relevant information, and, in a manner consistent with ordinary business care and prudence, relies on the adviser's professional judgment as to the taxpayer's tax obligations.  See United States v. Boyle, 469 U.S. 241, 251 (1985); Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  The professional's advice must be based on all pertinent facts and circumstances; "if the adviser is not versed in the nontax factors, mere

[*38] reliance on the tax adviser may not suffice." Todd v. Commissioner, T.C. Memo. 2011-123, 2011 WL 2183767, at *9, aff'd, 486 Fed. Appx. 423 (5th Cir. 2012); see also Gould v. Commissioner, 139 T.C. 418, 460 (2012), aff'd, __ Fed. Appx. __, 2014 WL 279863 (4th Cir. Jan. 27, 2014).

Petitioner argues that his reliance on the advice of his tax adviser satisfies all three elements of the Neonatology test but offers very little evidence in support of his argument. As we have found, petitioner's 2006 return was prepared by Ms. Elliott, who received petitioner's financial records from his bookkeepers. Petitioner has not shown that he or his staff provided Ms. Elliott with all the necessary and accurate information to properly prepare his return. Indeed, the abundance of errors, inconsistencies, and duplicate deductions associated with the claimed loss deductions suggests the contrary. Petitioner claimed deductions based on the indemnification agreement of $163,962 on his 2001 return and $59,433 on his 2005 return, then deducted those amounts again on his 2006 return. Petitioner claimed deductions for expenses related to his condominium on his tax returns for 2000, 2001, 2002, 2004, and 2005; he then claimed those amounts again as expenditures related to the indemnification agreement on his 2006 return. Further, many expenditures listed by petitioner predate the agreement itself.

**[\*39]** In addition, petitioner has not shown what advice, if any, his return preparer provided regarding the tax treatment of the bad debts or the indemnification losses, or whether he relied on that advice in good faith. Section 1.6664-4(c)(2), Income Tax Regs., defines "advice" as any communication "setting forth the analysis or conclusion * * * provided to (or for the benefit of) the taxpayer and on which the taxpayer relies, directly or indirectly, with respect to the imposition of the section 6662 accuracy-related penalty." Petitioner claims that his return preparer furnished advice, and that he relied on that advice, but he does not specify the nature or substance of that advice. Reliance on the mere fact that a certified public accountant has prepared a tax return does not mean that she "opined on any or all of the items reported therein." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 100.

Petitioner has failed to establish that he is entitled to relief under section 6664(c). Therefore, we sustain respondent's imposition of the section 6662(a) accuracy-related penalty.

V.  Conclusion

We sustain respondent's adjustments disallowing petitioner's nonbusiness bad debt deductions. We also sustain respondent's disallowance of petitioner's

[*40] claimed loss deduction with respect to the indemnification agreement. We further sustain respondent's determination of a section 6662(a) accuracy-related penalty.

<u>Decision will be entered for respondent in the reduced amounts</u>.