T.C. Memo. 2012-308

UNITED STATES TAX COURT

JUAN M. HERRERA AND SUSANA M. HERRERA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9481-10.                      Filed November 5, 2012.

        Ps reported flowthrough income from P-H's business on their
2006 and 2007 tax returns.  R determined that bad-debt deductions
claimed by the business for the 2006 and 2007 tax years were
erroneous and accordingly Ps' income for the 2006 and 2007 tax years
should be increased.  R also determined Ps were liable for an I.R.C.
sec. 6651(a)(1) addition to tax for the 2007 tax year.

        <u>Held</u>:  R's determinations are sustained.

<u>John Edward Leeper</u>, for petitioners.

<u>Jeffrey D. Heiderscheit</u>, for respondent.

**[*2]**         MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, <u>Judge</u>:  This case is before the Court on a petition for

redetermination of income tax deficiencies respondent determined for petitioners'

2006 and 2007 tax years and a section 6651(a)(1) addition to tax respondent

determined for petitioners' 2007 tax year.[1]  The issues for decision are (1) whether

petitioners' income should be increased by $244,640 for the 2006 tax year and

$305,700 for the 2007 tax year because of adjustments to petitioner husband's share

of income from Herrera, Stafford, & Associates LLC (HSA) and (2) whether

petitioners are liable for an addition to tax under section 6651(a)(1) for failing to

timely file their 2007 Federal income tax return.  The resolution of the first issue

hinges on whether bad debt deductions HSA claimed for the 2006 and 2007 tax

years are erroneous.

FINDINGS OF FACT

Some of the facts have been stipulated.  The stipulations, with accompanying

exhibits, are incorporated herein by this reference.  At the time they filed their

petition, petitioners resided in Texas.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]**   Petitioner husband Juan Herrera (Dr. Herrera) graduated from the University of Texas El Paso (UTEP) with a bachelor's degree in both mechanical and metallurgic engineering.  After working for approximately five years, he attended the University of Houston, where he obtained a Ph.D. in mechanical engineering with a minor in metallurgic engineering.  After obtaining his Ph.D., he was hired as a professor of mechanical and metallurgical engineering by UTEP, where he taught for four years before taking a leave of absence to become director of engineering for Oilfield Industrial Meires, a company in Big Spring, Texas.  He worked there approximately one year before returning to UTEP, where he taught until his retirement in 2003.

In 1978 Dr. Herrera and Steve Stafford, another UTEP professor, formed Met-Tech, Inc. (MTI), a Texas corporation, as a vehicle through which they could perform engineering consulting work in the El Paso, Texas, area. Initially, Dr. Herrera and Dr. Stafford each owned 50% of the stock of MTI.  At the time MTI was organized, the consulting work was done on the side, with Dr. Herrera and Dr. Stafford both working for MTI around five to ten hours per week.

At the beginning, MTI operated strictly as an engineering consulting service corporation.  However, it grew--more equipment was purchased, a small machine shop where metals could be tested was added, and MTI began doing accident

[*4] reconstruction.  In the early 1990s MTI began hiring part-time students and engineers and increased the machine capabilities to build prototypes that needed to be tested.  In 2000 MTI hired Jeremy Bristow and, on the urging of Mr. Bristow, began performing steel fabrication work (building of steel structures for other companies).

By 2002 the steel fabrication business had grown to where it employed more people than the consulting business.  This, combined with the differences in work, equipment, management, and risk between the two businesses, led Dr. Herrera and Dr. Stafford to decide a second company should be formed.

HSA, a limited liability company, was formed on September 22, 2002, to perform the historic business of  engineering consulting while the steel fabrication business was continued through MTI.  HSA elected to be treated as a partnership for income tax purposes.[2]  For the tax years at issue, the parties stipulated that Dr. Herrera was the tax matters partner and owned either 97.65% or 100% of HSA.[3]

---

[2]HSA is a small partnership under the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648.

[3]HSA filed Forms 1065, U.S. Return of Partnership Income, for the 2006 and 2007 tax years.  Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., accompanying both Forms 1065 show Dr. Herrera's share of profit and loss at the beginning of the years to be 100% and at the end of the years to be 97.65%.  The Schedules K-1 show Dr. Stafford's share of profit and loss at the beginning of

(continued...)

**[*5]** For the 2006 tax year, Dr. Herrera owned 50% of MTI. For the 2007 tax year, he owned 100% of MTI. HSA uses a calendar year for tax purposes. MTI uses a tax year ending July 31.

Once the businesses were separated, MTI was never successful and had to rely on money from HSA and bank loans to survive. On its 2006 Form 1065 HSA claimed a bad debt deduction of $244,640. On its 2007 Form 1065 HSA claimed a bad debt deduction of $305,700. Respondent disallowed the claimed bad debt deductions for both tax years. Central to this case is whether the bad debt deductions HSA claimed are erroneous. Petitioners assert the claimed deductions represent amounts HSA lent to MTI which were not repaid. Respondent disagrees.

HSA's claimed bad debt deduction of $244,640 for the 2006 tax year comprised a "CPA Adjustment" and 11 checks written between July 18, 2004, and September 12, 2005. The CPA adjustment occurred and 3 of the 11 checks were written in 2004; the four amounts totaled $79,869.75. The remaining eight checks, totaling $164,770.31 were written in 2005.

---

[3](...continued)
the years to be 0% and at the end of the years to be 2.35%. This is apparently where the parties get their stipulation that Dr. Herrera owned either 100% or 97.65% of HSA. This Court notes that this cannot be literally correct since if Dr. Herrera owned only 97.65% on Dec. 31, 2006, he would still own that amount at the start of the day on Jan. 1, 2007, but may have bought some that day.

**[\*6]**  In its general ledger HSA recorded all 11 checks as well as the CPA adjustment as "DUE FROM MET-TECH".[4]  However, we note check No. 6166 written on June 8, 2005, for $19,575 to MTI and described as paid for MTI was not included in HSA's general ledger, nor was the amount claimed as a bad debt deduction.

On its general ledgers as of July 31, 2004, MTI showed $45,560 as due to HSA, and after adding 2005, MTI reported for both years 8 of the 11 checks totaling $188,165.31 as being due to HSA.  MTI's general ledger also reported adjustments and other transactions resulting in the general ledger's showing $444,878.68 being due to HSA as of July 31, 2005.  The general ledger shows this same amount still due to HSA as of July 31, 2007.  However, MTI's balance sheet as of July 31, 2007, showed $293,653.68 due to HSA.[5]

---

[4]For 2004 HSA's general ledger showed a beginning balance due from MTI of zero and an ending balance of $79,869.75.  For 2005 the general ledger showed a beginning balance of $79,869.75 and an ending balance of $244,640.06.  HSA's Form 1065 for the 2004 tax year matched its general ledger, showing that at the beginning of the tax year MTI owed HSA zero and at the end of the year $79,870.  However, Form 1065 for the 2005 tax year did not match the general ledger, showing $79,870 due at the beginning of the year but $258,140 due from MTI at the end of the year.  We assume the $13,500 difference is due to a "CPA Adj for rental of Beamline" made by "Brenda" to HSA's general ledger recorded as having occurred on August 31, 2006.

[5]An additional apparent discrepancy, on its Form 1120, U.S. Corporation

(continued...)

**[\*7]** HSA reported a bad debt deduction of $305,700 for the 2007 tax year. This amount comprised a CPA adjustment for the Beamline rental of $13,500, a check for $97,000 written to MTI, a check for $100,000 written to Wells Fargo in 2007, a check dated October 24, 2007, for $10,000 described on HSA's ledger as "Met-Tech Steel Fab", and $90,200 in "bank drafted payments on the notes". It also took into account a $5,000 payment MTI made to HSA on November 17, 2007. HSA recorded the CPA adjustment, and the $97,000, $100,000 and $10,000 checks as well as its $5,000 payment to HSA in its general ledger as due from MTI.

Part of the amount deducted as a bad debt deduction for 2007 consisted of amounts lent by Wells Fargo and repaid by HSA. Dr. Herrera first went to Wells Fargo when he "decided HSA should not be 'funding' Met Tech, Inc." A business loan and revolving line of credit was issued on August 9, 2004, with a principal

---

[5](...continued)
Income Tax Return, for its tax year ended July 31, 2004, is reflected in MTI's listing as a current liability $45,560 due to HSA. However, on its Form 1120 for the tax year ending July 31, 2005, MTI listed under "Loans from shareholders" a beginning balance of $45,560 and an ending balance of $444,879.

[*8] amount of $300,000 and a maturity date of August 15, 2005.  Both HSA and

MTI were listed as borrowers, although HSA did not receive any of the proceeds.[6]

On June 2, 2005, MTI renewed a $500,000 line of credit.[7]  MTI was the only

borrower shown on this loan.  The maturity date was June 15, 2006.  Dr. Herrera,

along with Mayra S. Bristow and Jeremy M. Bristow, guaranteed repayment of the

$500,000 loan.  On September 13, 2006, the maturity date on the $500,000 loan

was extended to December 12, 2006, as a result of MTI's being able financially to

make only interest payments at that time.

On January 18, 2007, a $500,000 revolving line of credit was issued to HSA

by Wells Fargo, with MTI, Met-Tech Steel Fabrication, Inc., and Dr. Herrera

signing as guarantors.  Of the available $500,000 loan proceeds $497,999.85 was

used to pay off the balance remaining on the $500,000 line of credit issued to

MTI.  Loan principal payments on the January 18, 2007, loan were made via an

automatic deduction from HSA's checking account with $10,000 per month being

---

[6]MTI had another loan from Wells Fargo that predated the August 9, 2004, loan cosigned by HSA.  MTI's general ledger and Form 1120 for MTI's year ended July 31, 2004, show a balance of $98,604.72 owed to Wells Fargo.

[7]Dr. Herrera testified that the June 2, 2005, renewal was related to and replaced the August 9, 2004, loan in the amount of $300,000.

**[*9]** a starting point for the amount automatically drafted to pay the outstanding balance.

Wells Fargo concluded that MTI could not pay the bank back. A Wells Fargo loan officer indicated: "Met Tech can't pay it anymore. You signed as a co-signer. You're now responsible for it. We're going to change that loan to your name, Herrera Stafford." According to Dr. Herrera, at this time MTI was still responsible for interest payments.[8] We presume, although the evidence record is not explicit, that the $100,000 check written to Wells Fargo and the $90,200 in bank draft payments on the note, which were included in the amount HSA deducted on its 2007 tax return, were used to pay off the January 18, 2007, loan.

MTI ceased steel fabrication work in 2007. After the debt was written off in 2007, there were no additional advances to MTI by HSA. Dr. Herrera signed all of the checks written to or on behalf of MTI. He stated that he characterized the checks written as loans to MTI because he "expected [HSA] to be paid back." Dr. Herrera thought MTI would grow, become profitable, and then pay HSA back.

---

[8]By March 4, 2008, MTI was not able to make the interest payments on the loan, the principal amount of which had been lowered to approximately $267,000. At this time HSA began making both interest and principal payments. HSA eventually paid off the loan.

**[\*10]** MTI did not provide any security to HSA for the loans. HSA did not send to MTI or file with respondent an IRS Form 1099-C, Cancellation of Debt, for either the 2006 or 2007 tax year. No formal loan documents were ever executed between MTI and HSA. There was no established repayment schedule or interest rate. There was no due date established. HSA did not sue or threaten to sue MTI on the debt. Mr. Herrera explained: "That'd be suing myself, so nobody did." As of the date of trial MTI had not formally gone out of business or filed for bankruptcy protection.

For the 2007 tax year petitioners received an extension of time to file until October 15, 2008. Petitioners' Form 1040, U.S. Individual Income Tax Return, for the 2007 tax year was received by the Internal Revenue Service on October 21, 2008. The envelope in which they mailed their 2007 tax return bears a private postage meter stamp but does not bear a postmark showing the date it was mailed.

On February 2, 2010, respondent issued to petitioners a notice of deficiency determining deficiencies in income tax for the 2006 and 2007 tax years of $86,846 and $106,995, respectively, and a section 6651(a)(1) addition to tax for the 2007 tax year of $2,684.65. The deficiencies resulted from respondent's determinations that HSA's claimed bad debt deductions of $244,640 and $305,700 for the 2006 and 2007 tax years, respectively, were erroneous and consequently petitioners had

[*11] underreported their share of the flowthrough income from HSA for both years.[9] Petitioners timely petitioned this Court.

OPINION

I.    Bad Debt Deductions

Section 166(a) provides as a general rule that a deduction shall be allowed for "any debt which becomes worthless within the taxable year." Section 166 distinguishes business bad debts from nonbusiness bad debts. Sec. 166(d); sec. 1.166-5(b), Income Tax Regs. Business bad debts may be deducted against ordinary income whether wholly or partially worthless during the year (to the extent of the amount that becomes worthless). Sec. 1.166-3, Income Tax Regs. A nonbusiness bad debt may be deducted, but only when it becomes completely worthless in the year for which it is claimed, and then only as a short-term capital loss. Sec. 166(d). There is no bad debt deduction without a bona fide debt. See sec. 1.166-1(c), Income Tax Regs.

Respondent asserts three bases to support his adjustments to petitioners' income. First, he asserts the transfers HSA made to or for MTI do not constitute bona fide debt. Second, he asserts that even if the transfers constitute bona fide

_____

[9]There was also a reduction made in petitioners' claimed itemized deductions for 2006, but that adjustment is a purely correlative computational adjustment due to petitioners' increased adjusted gross income.

**[\*12]** debt, petitioners have not demonstrated the debt became worthless in the tax years at issue. Third, respondent asserts any bona fide debt would be deductible only as a short-term capital loss for the year in which it became completely worthless. Because we conclude that the transfers do not constitute bona fide debt, we need not address respondent's other contentions.

The regulations define a bona fide debt as one "which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs. A gift or contribution to capital is not considered to create a debt for purposes of section 166. Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income Tax Regs. We determine whether a purported debt is in substance and fact a debt for tax purposes from the facts and circumstances of each case, with the taxpayer bearing the burden of proof. Berkowitz v. United States, 411 F.2d 818, 820 (5th Cir. 1969); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980); see also Piggy Bank Stations, Inc. v. Commissioner, 755 F.2d 450, 452-453 (5th Cir. 1985), aff'g T.C. Memo. 1983-668; Kean v. Commissioner, 91 T.C. at 594; Fisher v. Commissioner, 54 T.C. 905, 909 (1970) ("Whether a bona fide debtor-credit relationship exists is a question of fact to be determined upon a consideration of all the pertinent facts in the case.").

**[*13]** Advances between related entities are subject to particular scrutiny. See

Canaveral Int'l Corp. v. Commissioner, 61 T.C. 520, 543-544 (1974) (holding that

the facts of a transaction between affiliated corporations "must be carefully

scrutinized to see whether the loss has economic reality or is the result of the

shuffling of funds or assets between related entities"); see also Tex. Farm Bureau v.

United States, 725 F.2d 307, 310 (5th Cir. 1984) (acknowledging the

"lender/shareholder's dual interest in the corporation" when shareholders provided

money to a closely held corporation); Fries v. Commissioner, T.C. Memo. 1997-93.

In resolving similar questions, courts have identified and considered various

factors to use in determining whether bona fide debt exists. See Dixie Dairies Corp.

v. Commissioner, 74 T.C. at 493 (and cases cited threat). The Court of Appeals

for the Fifth Circuit, the court to which this case is appealable absent a stipulation to

the contrary, has articulated 13 factors:

> "1) the names given to the certificates evidencing the indebtedness;
> (2) the presence or absence of a fixed maturity date; (3) the source of
> payments; (4) the right to enforce payment of principal and interest;
> (5) participation in management flowing as a result; (6) the status of
> the contribution in relation to regular corporate creditors; (7) the
> intent of the parties; (8) "thin" or adequate capitalization; (9) identity
> of interest between creditor and stockholder; (10) source of interest
> payments; (11) the ability of the corporation to obtain loans from
> outside lending institutions; (12) the extent to which the advance was

**[*14]** used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement." [Tex. Farm Bureau, 725 F.2d at 311, quoting Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972).]

The identified factors are not equally significant, nor is any single factor determinative. Dixie Dairies Corp. v. Commissioner, 74 T.C. at 493 (citing Estate of Mixon, 464 F.2d at 402, and John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946)); see also Tex. Farm Bureau, 725 F.2d at 311 (excluding certain factors from analysis "because of the particulars of the transaction" before them). The various factors "are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship". Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). Or as this Court has phrased it: "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973).

The facts of this case overwhelmingly indicate that the advances and payments HSA made to or for MTI were not bona fide debt. The lack of a promissory note, bond, or indenture evidencing MTI's alleged indebtedness to

**[\*15]** HSA; the lack of a definitive maturity date; the lack of a repayment schedule; the de facto subordination of the HSA debt to MTI's other debt; the failure of HSA to require MTI to provide security or collateral; and the source of repayment's being tied to the fortunes of the business all point to the fact that the advances were not bona fide debt. A number of cases explain these factors as follows: (1) Fries v. Commissioner, T.C. Memo. 1997-93 ("the presence of a definite maturity date indicates a fixed obligation to repay, which is characteristic of a debt obligation") (citing Estate of Mixon, 464 F.2d at 404); (2) Leuthold v. Commissioner, T.C. Memo. 1987-610 (noting in holding that the advances in question were not loans that the taxpayers did not receive or request any collateral or security and did not execute any loan document reflecting a right to enforce repayment); (3) Tomlinson v. 1661 Corp., 377 F.2d 291, 297-298 (5th Cir. 1967) (stating that subordination of what was "claimed" to be a loan to other creditors may evidence instead a contribution to capital); (4) Brazoria Cnty. Stewart Food Mkts., Inc. v. Commissioner, 48 Fed. Appx. 917, 2002 WL 31115069, at \*3 (5th Cir. 2002) (noting that "[n]ormal business practice would generally require contemporaneous instruments recording a debt"), aff'g in part, vacating in part T.C. Memo. 2001-220; and (5) Kean v. Commissioner, 91 T.C. at 595-596 ("The lack of formal debt instruments and of agreements as to security, time for

**[\*16]** repayment, and obligation to pay interest, is significant \* \* \* evidence that the transfers did not give rise to bona fide debts.").

Of particular importance is the fact that no interest was paid or accrued. A "true lender is concerned with interest." Curry v. United States, 396 F.2d 630, 634 (5th Cir. 1968). HSA's failure to insist on interest payments clearly demonstrates that it was not concerned with interest income but rather with the continued operation and growth of MTI. We acknowledge that both HSA and MTI recorded on their general ledgers and tax returns some of the payments as being due to HSA. However, the recording was not consistent, and not every payment HSA made to MTI was recorded this way. And there is no proof that the CPA adjustments which made up part of the amounts deducted for both years were even monetary outlays on HSA's part.

We recognize the amount claimed as a deduction for 2007 was made up in part of payments HSA made to Wells Fargo during the 2007 tax year.[10] However,

---

[10]Payment by a shareholder of a guaranteed debt obligation may in economic substance be either a contribution of capital to, or a loan to, the corporation for which the guaranty was made. Titmas v. Commissioner, T.C. Memo. 1995-267; see also Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712, 722-723 (5th Cir. 1972), aff'g T.C. Memo. 1970-182. Capital contributions are not debt for purposes of sec. 166(a)(1). Roth Steel Tube Co. v. Commissioner, 800 F.2d 625, 629 (6th Cir. 1986), aff'g T.C. Memo. 1985-58. A guarantor of a corporate obligation may not deduct the payment as a bad debt to satisfy the guaranty if, considering the

(continued...)

**[*17]** and importantly, the only Wells Fargo note outstanding during the 2007 tax year, as far as this Court is aware, was the January 18, 2007, $500,000 revolving line of credit on which HSA was the borrower, not MTI. For the reasons discussed above, the advances HSA made to or for the benefit of MTI were not bona fide debt; accordingly, the claimed bad debt deductions were erroneous, and respondent's adjustments to petitioner's income are sustained.

II.     Section 6651(a)(1) Addition To Tax

A. Burden of Proof

Respondent bears the burden of production with regard to the additions to tax. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). To meet this burden, respondent must produce sufficient evidence establishing that it is appropriate to impose the additions to tax. See Higbee v. Commissioner, 116 T.C. at 446. However, respondent does not have to produce evidence of

_____

[10](...continued)
circumstances when the guaranty was created, the guaranty was a contribution to the capital of the corporation. Casco Bank & Trust Co. v. United States, 544 F.2d 528, 534-535 (1st Cir. 1976). Traditional debt-equity principles apply in deciding whether a guaranty is a capital contribution or a loan. Plantation Patterns, Inc. v. Commissioner, 462 F.2d at 722-723. Inadequate initial capital suggests that a guaranty of a corporation's debt may be an equity interest. Id. at 722. If no outside source would advance funds without the guaranty, this suggests an equity interest. Id. Here, there is no evidence that an outside source would have advanced MTI funds without HSA's or Dr. Herrera's guaranty.

**[\*18]** substantial authority, lack of reasonable cause, or lack of willful neglect.  See id. at 447; Davis v. Commissioner, 81 T.C. 806, 820 (1983), aff'd without published opinion, 767 F.2d 931 (9th Cir. 1985).

B.  Section 6651(a)(1) Addition to Tax

As a general rule, "any person made liable for any tax * * * shall make a return or statement according to the forms and regulations prescribed by the Secretary."  Sec. 6011(a).  Section 6651(a)(1), in the case of a failure to file a return on time, imposes an addition to tax of 5% of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file, not to exceed 25% in the aggregate.   The penalty will not apply if it is shown that such failure "is due to reasonable cause and not due to willful neglect".  Sec. 6651(a)(1).

The parties have stipulated that petitioners' 2007 tax return was received by respondent on October 21, 2008.  It was due October 15, 2008.  Accordingly, respondent has met his burden of production.  Petitioners bear the burden of proving either that they did in fact timely file their 2007 tax return or that they meet the reasonable cause exception to the section 6651(a)(1) addition to tax.  The tax return was due October 15, 2008, as the result of an extension of the April 15,

[*19] 2008, filing date. Dr. Herrera testified he believed he put the tax return in the mail October 15, 2008.

Pursuant to section 7502(a), when a return is delivered by U.S. mail to the Internal Revenue Service after the date prescribed for its filing, the date of the U.S. Postal Service postmark found on the envelope carrying the return is deemed the date the return is filed. The parties have agreed that the postmark on the envelope containing petitioners' tax return was made by a private postage meter. However, section 7502 applies in the case of postmarks not made by the U.S. Postal Service only to the extent allowed by the regulations promulgated under the authority of section 7502(b). See Stotter v. Commissioner, 69 T.C. 896, 897 (1978); see also Finley v. Commissioner, T.C. Memo. 1983-295.

Section 301.7502-1(c)(1)(iii)(B), Proced. & Admin. Regs., provides that a privately metered mailing of a return qualifies for the timely mailing rule only if two conditions are satisfied: (1) the postmark on the envelope bears a legible date on or before the prescribed date for filing and (2) the IRS receives the tax return no later than the time in which a letter would ordinarily be received if mailed from the taxpayer's point of origin on the day the return was due.[11] If the return is not

---

[11]Congress permitted the use of private postage meters only pursuant to regulations. Sec. 7502(b). This is because they recognized "the potential for

(continued...)

**[\*20]** received in the ordinary course of the mails, it is nevertheless treated as timely if the taxpayer establishes (1) that the return was actually deposited in the mail before the last collection of mail on or before the last day prescribed for filing, (2) that the delay was due to a delay in transmission of the mail, and (3) the cause of such delay. Sec. 301.7502-1(c)(1)(iii)(B)(2), Proced. & Admin. Regs.

The envelope in which petitioners' return was mailed does not bear a legible postmark. Therefore, petitioners have not met the first prong of the regulation. However, this Court has previously held: "Where non-Postal Service postmarks are used, the statute does permit extrinsic evidence other than the tangible evidence of the postmark. In such cases, the regulations require the timely private postage meter postmark date to be independently corroborated by facts beyond the taxpayer's control." Estate of Campilongo v. Commissioner, T.C. Memo. 1996-478 (citing Wiese v. Commissioner, 70 T.C. 712, 714-715 (1978)). We recognize that the Courts of Appeals are split on the issue of whether extrinsic evidence is allowed. See Me. Med. Ctr. v. United States, 675 F.3d 110, 116 (1st Cir. 2012) (noting the circuit split); Spencer Med. Assocs. v. Commissioner, 155 F.3d 268,

---

[11](...continued)
mischief or innocent error in the setting of the date with privately metered mail, a potential either greatly attenuated or non-existent in mail postmarked by the postal service". Rotenberry v. Commissioner, 847 F.2d 229, 230-231 (5th Cir. 1988) (fn. ref. omitted).

**[*21]** 271-272 (4th Cir. 1998) (same), aff'g T.C. Memo. 1997-130; Anderson v.

United States, 966 F.2d 487, 489-491 (9th Cir. 1992) (adopting rule allowing

extrinsic evidence to prove timely delivery and noting the circuit split on the issue);

Redman v. Commissioner, 820 F.2d 209, 212 (6th Cir. 1987) ("The use of extrinsic

evidence to establish the mailing date would defeat the purpose of the 'timely

mailing-timely filing rules.").[12]  Neither have the parties cited nor can we find any

Fifth Circuit precedent directly on point; regardless, we need not address this

because even if extrinsic evidence were allowed, petitioners have still not met their

burden of proof, for two reasons.

---

[12]We also note sec. 301.7502-1(e)(2), Proced. & Admin. Regs., which was proposed on September 21, 2004, see 69 Fed. Reg. 56377, effective for documents mailed after that date.  It was finalized and made retroactive to September 21, 2004, on August 23, 2011. See T.D. 9543, 2011-40 I.R.B. 470.  The regulation provides:

> Other than direct proof of actual delivery, proof of proper use of registered or certified mail, and proof of proper * * * duly designated PDS as provide for by paragraph (e)(2)(ii) of this section [equivalents of registered or certified mail], are the exclusive means to establish prima facie evidence of delivery of a document to the agency, officer, or office with which the document is required to be filed.  No other evidence of a postmark or of mailing will be prima facie evidence of delivery or raise a presumption that the document was delivered.

Neither party addressed this regulation; and because we hold that even if extrinsic evidence were allowed, petitioners did not meet their burden of proof, we need not address it further here.

[*22] First, petitioners appear to assert that Dr. Herrera's testimony that "I can't tell you exactly the date, but I do remember trying to make the deadline, which was the 15th", standing alone, establishes that they mailed their 2007 tax return on October 15, 2008. We do not agree. Dr. Herrera was not even sure of when he mailed the return; he merely remembers "trying to make the deadline." And there was no additional evidence, such as corroborative testimony, to back up his statement. See Davis v. United States, 43 Fed. Cl. 92, 95 n.5 (1999) (holding that even if the court allowed extrinsic evidence the taxpayer's "uncorroborated testimony of mailing is insufficient to prove timely filing"), aff'd without published opinion, 230 F.3d 1383 (Fed. Cir. 2000).

Second, proving that the return was placed in the mail on or before the due date is not enough in the case of a private postage meter. Petitioners must also prove that the return was received no later than it would have been received if postmarked by the U.S. Postal Service or establish that the delay in receiving the document was due to a delay in the transmission of the U.S. mail and the cause of that delay. Sec. 301.7502-1(c)(1)(B), Proced. & Admin. Regs. Petitioners did not do this. They merely presume that it ordinarily takes six days for mail to go from San Antonio, Texas, to Austin, Texas. See Ernest v. Commissioner, T.C. Memo. 2002-23 (noting that the taxpayers bore the burden of proving that a nine-day

**[\*23]** delivery time is within the normal mailing period for mail sent from Oakland, California, to Washington, D.C.); Finley v. Commissioner, T.C. Memo. 1983-295 (holding that the taxpayers' petition for redetermination of a deficiency was untimely when the taxpayers did not show that a six-day delay in receiving the petition was due to a delay in the transmission of the mail and the cause of the delay).

Petitioners also assert that even if the return was not timely filed they meet the reasonable cause exception to the section 6651(a)(1) addition to tax, stating: "Furthermore, the fact that the postal service did not print a legible postmark is clearly not the petitioners' fault and should be considered reasonable cause sufficient to abate the penalty." We sympathize with petitioners. However, they were in control here. And it has been established that the U.S. Postal Service does not ordinarily postmark envelopes bearing a postmark made by a private postage meter. See Hanna & Assocs. v. Commissioner, T.C. Memo. 1997-376. Petitioners could have sent their return by registered or certified mail or made sure that a postmark date was affixed to the envelope they sent their return in. B.D. Morgan & Co. v. Commissioner, T.C. Memo. 1988-569 ("the taxpayer must assume the risk of late delivery"). They chose not to, and on the evidence before us we cannot find that they timely filed their return or that they met the reasonable cause

**[\*24]** exception.  Accordingly, we will sustain respondent's 2007 addition to tax determination.

The Court has considered all of petitioners' contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.