T.C. Memo. 2018-37

UNITED STATES TAX COURT

POVOLNY GROUP, INCORPORATED, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5935-14, 5936-14,          Filed April 2, 2018.
            5937-14.

Mark A. Pridgeon, for petitioners.

Julie A. Schwoebel, Christina L. Cook, John Q. Walsh, Jr., and John
Schmittdiel, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge: James Povolny ran three real-estate businesses--one of

which racked up a lot of liabilities trying to build a hospital in Algeria. To pay

---

[1] The other cases we consolidated with this one are Povolny Group,
Incorporated, docket number 5936-14; and James M. Povolny and Deborah A.
Povolny, docket number 5937-14.

[*2] some of those liabilities, Povolny used his other companies' money. He says these payments were loans and that he can deduct them as bad debts. The Commissioner says they were really distributions and wages and that Povolny owes taxes on them.

FINDINGS OF FACT

Povolny is an ambitious and accomplished real-estate entrepreneur with a strong inclination toward hard work. He started building his career early--he went to a private Junior ROTC high school and then on to college where he studied electrical engineering for a year. He left, got married, and joined the Air Force. Sergeant Povolny finished his tour of duty and went on to serve in the Minnesota Air National Guard for two-and-a-half years. During that time he also worked in maintenance at a real-estate development company *and* attended night school. He rose steadily through the ranks, and went from maintenance to become a principal in the firm. After eighteen years, he left in 1996 to join his wife's company, Archetone Limited.

Povolny's wife had started Archetone Limited sometime in the 1980s. Archetone Limited is an S corporation[2] and Povolny owns 49% of it--his wife

---

[2] If a business meets the requirements of section 1361, it may elect to be treated as an "S corporation" and generally avoid corporate tax. Secs. 1362(a),
(continued...)

[*3] owns the other 51%. Povolny considered it a small general-contracting firm and hoped to use it to build his own real-estate company. This proved difficult. So in 2002 Povolny formed Povolny Group (PG), a real-estate brokerage firm. Povolny is PG's president, CEO, and sole shareholder.

Povolny didn't focus much on PG and, when the recession hit in 2008, PG's book of business all but dried up. Archetone Limited's business--which had been mostly regional--dried up too. By 2009, Archetone Limited had no book of business; the phones just stopped ringing.

At that point Povolny recalled a chat he'd had with an old Air Force buddy a few years back. Povolny's friend had gone to work for the VA and wanted him to take advantage of some of the opportunities it offered. PG and Archetone Limited were doing well then, and Povolny didn't have time to explore any new opportunities. The recession, however, gave him the perfect chance to take his business in a different direction. Povolny discovered that the VA gave preference on some construction contracts to disabled veterans who owned their own

---

[2](...continued)
1363(a). An S corporation's income and losses, like a partnership's, flow through to its shareholders, who then pay income tax. See sec. 1363(b). (All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.)

[*4] business.  Povolny realized that he qualified, so he got the required certifications and began working on federal projects.

Things went well for a while.

Then came Algeria.

The Algerian Ministry of Health decided to build a new hospital in Tablat. Povolny submitted several bids and won a contract to build the hospital.  He formed Archetone International LLC (Archetone International)--which he solely owns--and opened a bank account for it in Algeria.  But construction in Algeria is complicated, and Povolny testified that the government there required a bank guaranty.  Povolny tried to get one from Wells Fargo in the United States, but they were able to give him only a line of credit, which he converted into a bank guaranty with a correspondent bank in London.  That line of credit required cash collateralization, so Povolny and his entities each took out a series of small loans from other lenders.

But even with the right funding, the project quickly started to head south. Povolny had to stop work three times because the Algerian Government wasn't paying him.  Povolny testified that he suspected that the underlying reason for the delay was that the project, while *for* the Algerian Government, was funded by an organization from a third country whose representative expected under-the-table

[*5] consideration to keep things moving.  Povolny did not go along, and the progress payments stopped progressing.  These significant delays prompted the Algerian Government to shut the project down, and this left Archetone International with a lot of outstanding liabilities and not much money to pay them with.

Povolny did not want Archetone International to default, but that company had little money.  So Povolny decided to tap the assets of the other companies that he controlled.  And that's where the problems that led to these cases began, for he considered PG and Archetone Limited to be related entities and "didn't see the merit" in creating any formal notes or other documentation when he began moving money.  In 2010 he had PG pay a bit more than $70,000 of Archetone Limited's and Archetone International's debts.  On its ledgers PG now lists these amounts as being owed to it.  But on its 2010 tax returns--it filed an initial return and two amended returns, each as a C corporation[3]--PG claimed them as costs of goods sold (COGS).  And because PG was apparently making money again--on each of its returns it listed more than $879,000 in gross receipts--there was enough income

---

[3] "C corporation" is tax jargon for a corporation not taxed under subchapter S of the Code.  A C corporation's net income is taxed twice--first at the corporate level, and again at the individual level when the shareholders receive distributions of profits in the form of dividends.

[*6] to make these claimed COGS valuable.[4]  For that year PG also issued Povolny a W-2 that showed about $74,000 in wages, but later issued him a corrected W-2 that reduced the amount to only about $29,000.

In 2011 PG paid Povolny over $77,000, which he used to pay more of Archetone International's debts.  PG's ledgers characterized these payments as "Distributions".  PG itself also directly paid another nearly $74,000 of Archetone Limited's and Archetone International's expenses, which PG's ledger simply calls "Archetone Payments."  That year PG filed its tax return as an S corporation, reporting over $1 million in gross receipts, with $316,000 in ordinary business income flowing through to the Povolnys.  The Povolnys on their joint return claimed an over $290,000 flowthrough loss from Archetone Limited--a loss that was principally derived from Archetone Limited's claimed $74,000 deduction for "Loss on Archetone International Expenses Paid" and its claimed $241,000 deduction for "Loss on Archetone International Bad Debt."  Povolny's 2011 W-2 from PG, meanwhile, reported only about $44,000 in wages.

During the years at issue Povolny hired a CPA to prepare his and PG's tax returns.  But Povolny didn't give this CPA receipts or other supporting

---

[4] Even after including the $70,000 in its COGS, in 2010 PG reported around $435,000 in gross profit and over $151,000 in taxable income.

**[\*7]** documentation beyond what his QuickBooks reflected. Povolny also told this CPA that Archetone International never received any revenue, even though it had received at least some payments on the Algerian hospital contract.

PG's 2010 and 2011 tax returns were timely, as were the personal returns that Povolny and his wife jointly filed for those years. The Commissioner issued PG a notice of deficiency for 2010 and issued the Povolnys a notice of deficiency for 2010 and 2011.[5] The Commissioner also issued PG a notice of determination of worker classification for 2011 finding that PG owed $9,015 in FICA taxes on the $77,000 it gave Povolny and the $74,000 it used to pay Archetone Limited's and Archetone International's expenses.[6]

PG was incorporated in and maintained its primary place of business in Minnesota when it timely filed its petitions. The Povolnys were Minnesota residents when they filed their petition. We tried the case in St. Paul. The

---

[5] The notice of deficiency the Commissioner issued the Povolnys includes changes for 2011 related to PG, which was an S corporation that year.

[6] FICA taxes are those that the Federal Insurance Contributions Act imposes on employers and employees. See secs. 3101, 3111. FICA generally includes a 12.4% Social Security tax and a 2.9% Medicare tax, but wages over a certain annual limit are subject only to the 2.9% Medicare tax. Secs. 3101, 3111, 3121(a)(1). Employers and employees each pay half of the FICA taxes, and employers are required to withhold the employee's portion. Secs. 3101, 3102(a), 3111.

[*8] Commissioner asserted that Povolny and PG owed accuracy-related penalties, and Povolny contested them in the petitions. The Commissioner, however, introduced no evidence at trial that he had complied with section 6751. See Graev v. Commissioner (Graev III), 149 T.C. ___, ___ (slip. op. at 13-15) (Dec. 20, 2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing 147 T.C. ___ (Nov. 30, 2016).

OPINION

Povolny concedes several of the Commissioner's adjustments. Five issues remain for decision:

- Was PG's 2010 payment of $70,000 to creditors of Archetone Limited and Archetone International a loan between PG and those companies or a capital contribution that was also a constructive dividend to Povolny?

- Is Archetone Limited entitled to a bad-debt deduction for 2011 for $241,000 in payments it made to Archetone International's creditors from 2005 to 2008 and $74,000 in payments PG made in 2011?

- Should PG's 2011 payments of $77,000 to Povolny and $74,000 directly to creditors of Archetone Limited and Archetone International be taxed as wages to Povolny?

- Does PG owe employment taxes on those $77,000 and $74,000 payments?

**[*9]** ●     Are PG and the Povolnys liable for accuracy-related penalties under section 6662 for the years at issue?

We will address each issue in turn.

I.    <u>Loans or Constructive Dividends?</u>

In 2010 PG claimed a $70,000 COGS adjustment for expenses of Archetone Limited and Archetone International that it had paid. PG now argues it was a loan. The Commissioner says that the payment was only disguised as a loan and was really a contribution of capital by PG to Archetone Limited and Archetone International. According to him, this made the payment a constructive dividend to Povolny under sections 301 and 316--which would mean no deduction for PG and an increase in income for Povolny.[7]

A.    <u>Debt or Capital Contribution?</u>

A *bona fide* debt "arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs.; <u>see also</u> <u>Kean v. Commissioner</u>, 91 T.C. 575,

---

[7] The Commissioner's brief collapses the two parts of the argument, saying that because the payments weren't debt they were constructive dividends. That's understandable, because the payments here went directly from PG to Archetone Limited's and Archetone International's creditors. But payments on behalf of a related entity can still be capital contributions to that entity. <u>See</u> <u>Herrera v. Commissioner</u>, T.C. Memo. 2012-308, at *17 (payment "for the benefit of" sister corporation treated as capital contribution), <u>aff'd</u>, 544 F. App'x 592 (5th Cir. 2013).

**[*10]** 594 (1988).  Whether a transfer creates a *bona fide* debt or is instead an equity investment is a question of fact.  See United States v. Uneco, Inc. (In re Uneco, Inc.), 532 F.2d 1204, 1207 (8th Cir. 1976); see also Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).  To answer this question, we ask primarily whether there was "a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?"  Dixie Dairies Corp., 74 T.C. at 494 (quoting Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973)).  Case law gives us a small forest of factors to consider:

- "the names given to the certificates evidencing the indebtedness";

- the "presence or absence of a fixed maturity date";

- the "source of payments";

- the "right to enforce payments";

- whether there was "participation in management as a result of the advances";

- the "status of the advances in relation to regular corporate creditors";

- the "intent of the parties";

- any "identity of interest between creditor and stockholder";

- any "'thinness' of capital structure in relation to debt";

[*11] ● the "ability of [the] corporation to obtain credit from outside sources";

● the "use to which [the] advances were put";

● any "failure of [the] debtor to repay"; and

● the "risk involved in making [the] advances."

Id. at 493; see also Uneco, Inc., 532 F.2d at 1208. We're careful not to give any one factor undue weight. See Uneco, Inc., 532 F.2d at 1207.

PG's QuickBooks entries show the $70,000 in payments as "Due From Related Parties Write off - Archetone," which makes it seem as though PG intended the payments to be loans. But PG deducted the payments as "purchases" on all three versions of its 2010 tax returns, belying the QuickBooks label. And when PG made the payments, it didn't execute a note, set an interest rate, ask for security, or set a maturity date. The lack of these basic indicia of debt and PG's inconsistent labeling weigh in favor of finding that PG intended the payments to be capital contributions, not loans. See Shedd v. Commissioner, T.C. Memo. 2000-292, 2000 WL 1337177, at *3-*6.

So does the fact that Archetone Limited and Archetone International were broke when PG made the payments. Povolny testified that Archetone International "had no funds or wasn't capitalized," and he'd already given up on

[*12] its only contract--the Algerian hospital--for which it hadn't been paid anything since 2008. Archetone Limited's situation was similar--by 2009 it had virtually no book of business, its liabilities exceeded its assets, and it was losing money. So, PG's payments went to entities that were undercapitalized, would only be able to repay if they suddenly had earnings, and under those circumstances couldn't have obtained loans from outside lenders--all factors suggesting that the payments were capital contributions, not loans. See, e.g., Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 602-06 (1991); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 287-88 (1990).

A trial court is supposed to look at all these factors together, and the image that emerges is that Povolny treated legally separate corporations as one big wallet. Taking money from one corporation and routing it to another will almost always trigger bad tax consequences unless done thoughtfully. Povolny, though possessed of considerable practical intelligence in running his businesses, did not approach Archetone International's problems with any indication that he thought through these consequences or sought the advice of someone who could help him do so. One result is that we find that PG's $70,000 in payments were not loans to Archetone International and Archetone Limited but were instead capital contributions to these corporations. See Shedd, 2000 WL 1337177, at *3. The

[*13] lack of relevant evidence in the record itself also suggests that PG and the Archetone entities didn't intend to form a debtor-creditor relationship.

B.    Constructive Dividend?

We now turn to whether PG's payments were constructive dividends to Povolny. A *constructive* dividend occurs when "a corporation confers an economic benefit on a shareholder without the expectation of repayment." Magnon v. Commissioner, 73 T.C. 980, 993-94 (1980). A transfer between related corporations can be a constructive dividend to common shareholders even if those shareholders don't personally receive the funds. See, e.g., Benson v. Commissioner, T.C. Memo. 2004-272, 2004 WL 2698858, at *18-*22 (payments for purported royalties and nonexistent services between related entities were constructive dividend), supplemented by T.C. Memo. 2006-55, aff'd, 560 F.3d 1133 (9th Cir. 2009); Shedd, 2000 WL 1337177, at *6-*7 (advance between shareholder's entities was constructive dividend). That type of transfer is a constructive dividend if the common shareholder has direct or indirect control over the transferred property and the transfer wasn't made for a legitimate business purpose but instead primarily benefited the shareholder. Shedd, 2000 WL 1337177, at *6-*7; see also Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 641 (11th Cir. 1984), aff'g T.C. Memo. 1982-314.

**[*14]** Povolny had complete control over the transferred funds--he was and is the sole shareholder of PG and Archetone International and he owns 49% of Archetone Limited. And there was no discernible business reason for PG to make the transfer--as we found above, there was no hope of repayment or contemplation of interest. The transfer was undeniably bad for PG, but it was good for Povolny because it reduced his other entities' liabilities. PG's payment of $70,000 of Archetone International's and Archetone Limited's expenses was therefore a constructive dividend to Povolny.

## II.    Bad-Debt Deductions

On their 2011 tax return the Povolnys claimed an over $290,000 flowthrough loss derived from a $241,000 bad-debt deduction that Archetone Limited took for payments it made on Archetone International's behalf from 2005 to 2008 and a $74,000 deduction that it took for "Loss on Archetone International Expenses Paid." The Commissioner denied all of these deductions, increasing the Povolnys' flowthrough income from Archetone Limited by around $309,000.[8]

---

[8] The disparity between the contested deductions' total and the $309,000 adjustment is not a failure of arithmetic. Instead, the Commissioner tells us it's due to an "at risk limitation calculation" that is not part of the record. Because it favors the Povolnys, we'll keep the Commissioner's lower number.

**[*15]** Before there can be a bad-debt deduction there has to be a *bona fide* debt. Sec. 1.166-1(c), Income Tax Regs.; <u>Kean</u>, 91 T.C. at 594. Even when there's a *bona fide* debt, a bad-debt deduction is available only for the year that debt becomes worthless. Sec. 166(a)(1).

A.    *Bona fide* debt

We've already gone over what constitutes *bona fide* debt. <u>See</u> <u>supra</u> pp. 9-11. The same test applies here. We note first that the purported loans had none of the standard indicia of debt: no formal loan documentation, no set maturity date, and no interest payments. <u>See, e.g.</u>, <u>Hardman v. United States</u>, 827 F.2d 1409, 1412 (9th Cir. 1987) (formal loan documentation tends to show *bona fide* debt); <u>Estate of Mixon v. United States</u>, 464 F.2d 394, 404 (5th Cir. 1972) (fixed maturity date is characteristic of debt); <u>Am. Offshore, Inc.</u>, 97 T.C. at 605 (lack of interest payments suggests equity). We recognize that "transactions between closely held corporations and their shareholders are often conducted in an informal manner." <u>Epps v. Commissioner</u>, T.C. Memo. 1995-297, 1995 WL 389638, at *4. But because of the amount of the purported loans at issue here--over $300,000-- the lack of any loan documentation whatsoever weighs against a finding of debt. <u>See</u> <u>id.</u> (lack of formality weighs against debt finding where payment was $112,000).

**[*16]** The only documents Povolny produced about the purported loans were printouts of QuickBooks entries. At trial Povolny discussed a two-page printout from Archetone Limited's QuickBooks labeled "A/R Archetone International" that lists the $241,000 in payments that Archetone Limited deducted as "bad debt." The $74,000 that PG paid and that Archetone Limited deducted that same year as "Loss on Archetone International Expenses Paid" appears in two separate entries from PG's QuickBooks: one entitled "Quarterly Distributions" and another called "Due from Related Parties Write off - Archetone."[9] But we don't just look at the label a corporation sticks on a transaction; we look for proof of its substance. See, e.g., Shedd, 2000 WL 1337177, at *4. And there's none of that here--Povolny

---

[9] This fact is also relevant to the PG-wage issue that we'll discuss in the next section--i.e., whether PG's $74,000 in payments to Archetone International's and Archetone Limited's creditors were "loans" to those entities or compensation to Povolny. But there was another adjustment for those payments: Archetone Limited's $74,000 deduction--which flowed through to the Povolnys--was also disallowed by the Commissioner. There was some confusion at trial and in the briefs about this deduction. The Povolnys argued on brief that the $74,000 deduction was part of Archetone Limited's bad-debt deduction for 2011. So we've focused on that argument here. But even if it wasn't part of Archetone Limited's bad-debt deduction for 2011--for example, if it was a current claimed business expense by Archetone Limited--the Commissioner says that that adjustment was still appropriate because Povolny "failed to provide documentation or explanation for Archetone Limited having a business purpose for paying Archetone International's expenses." Povolny didn't have anything to say about that at trial or on brief, so we deem that issue conceded. See Rule 34(b)(4); McNeil v. Commissioner, T.C. Memo. 2011-150, 2011 WL 2559802, at *1 n.3, aff'd, 451 F. App'x 622 (8th Cir. 2012).

[*17] apparently didn't even give his CPA anything beyond such QuickBooks printouts. This strongly suggests that Povolny was simply trying to recast some of the investment in the failed Algerian hospital project as loans to recoup some of the loss. In other words, it wasn't *bona fide* debt.

Archetone International's lack of capital also suggests that what the Povolnys deducted weren't *bona fide* debts. A transferee's undercapitalization is strong evidence that the transfer is a capital contribution. Am. Offshore, Inc., 97 T.C. at 604. Here, Archetone International had no capital at all--Povolny testified that it "had no funds or wasn't capitalized, so it basically was capitalized through the assets that Archetone, Limited had." This complete lack of capitalization weighs heavily in favor of finding that the payments at issue were capital contributions and not *bona fide* debt.

Along the same lines, repayment dependent on earnings suggests that an advance is more likely to be equity. Estate of Mixon, 464 F.2d at 405; Am. Offshore, Inc., 97 T.C. at 602; Calumet Indus., Inc., 95 T.C. at 287-88; Provost v. Commissioner, T.C. Memo. 2000-177, 2000 WL 687889, at *5. And because Archetone International had no capital at the time of the purported loans, the only potential source of repayment was earnings on its single contract--the Algerian hospital. This, too, weighs against finding that a *bona fide* debt existed.

**[*18]** The evidence we have, then, shows no formal signs that a debt existed, and the underlying economics of the situation strongly suggests that Povolny was once again just using one of his companies' funds to pay another of the companies' debts. We therefore find that Archetone Limited's advances to Archetone International did not create *bona fide* debt.

### B.      Worthlessness

Even if Archetone Limited's advances to Archetone International did create *bona fide* debt, the Povolnys would still need to show that that debt became worthless in 2011. When a debt becomes worthless is a question of fact. Boehm v. Commissioner, 326 U.S. 287, 293 (1945); Am. Offshore, Inc., 97 T.C. at 594. This means that a taxpayer must show "identifiable events that form the basis of reasonable grounds for abandoning any hope of recovery." Aston v. Commissioner, 109 T.C. 400, 415 (1997) (citing Crown v. Commissioner, 77 T.C. 582, 598 (1981)). Caselaw reveals many objective criteria that can indicate a debt is worthless. They include:

- a decline in the debtor's business;

- a decline in the value of the debtor's assets;

- overall business climate;

- serious financial hardship suffered by the debtor;

[*19] ●      the debtor's earning capacity;

●      events of default;

●      insolvency of the debtor;

●      the debtor's refusal to pay;

●      actions taken by the creditor to pursue collection; and

●      subsequent dealings between the creditor and the debtor.

Am. Offshore, Inc., 97 T.C. at 594; see also Cooper v. Commissioner, T.C. Memo. 2015-191, at *17-*18.

It was Povolny's burden to show he's entitled to a deduction the Commissioner has disallowed. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). We have little but Povolny's uncorroborated testimony, however. He did testify that he didn't think the Algerian Government would ever pay Archetone International on its contract. This isn't enough--he didn't say why he thought that, and didn't show that he'd ever tried to collect what the Algerian Government owed him. He also had the burden to show that the debt became worthless specifically in 2011, yet he offered no proof at all of this key fact.

We find for the Commissioner on this issue.

**[\*20]** III.    <u>Wages</u>

Povolny argues that the $77,000 he received from PG in 2011--a payment he immediately used to pay other corporate debts--was either a distribution or a loan.  He also claims that the $74,000 PG used to pay Archetone Limited's and Archetone International's creditors was a loan.  The Commissioner says that both of these payments were wages to Povolny, and argues that PG just called them something else to avoid employment taxes.

We've already determined that the $74,000 payment--which was part of the purported "bad debt" that Archetone Limited tried to deduct that year--wasn't a loan.  As we pointed out, that payment lacked formal loan documentation, had no set interest rate or maturity date, was made to a company with no capital, and could be repaid only if that company generated earnings.  <u>See</u> <u>supra</u> pp. 15-18.  For the same reasons, the $77,000 payment couldn't have been a loan, either.  What remains is for us to determine whether the Commissioner properly characterized these payments as wages to Povolny, or if they are instead distributions.[10]

---

[10] On brief, Povolny refers to distributions in his headings, but then only argues that these payments were loans.  We'll nevertheless consider whether the Commissioner properly characterized them.

**[\*21]** Wages are payments for services performed.  David E. Watson, P.C. v. United States, 668 F.3d 1008, 1016 (8th Cir. 2012), aff'g 757 F. Supp. 2d 877 (S.D. Iowa 2010); see also Joseph M. Grey Pub. Accountant, P.C. v. Commissioner, 119 T.C. 121, 126 (2002), aff'd, 93 F. App'x 473 (3d Cir. 2004); secs. 31.3121(d)-1(b), 31.3306(i)-1(e), 31.3401(c)-1(f), Employment Tax Regs. Whether payments to an employee-shareholder are wages paid for services performed or something else--such as dividends or loan repayment--is a question of fact.  See David E. Watson, P.C., 668 F.3d at 1016.  We consider all the evidence and look to the substance of the situation, not the name the parties give a payment.  See id. at 1017; Veterinary Surgical Consultants, P.C. v. Commissioner, 117 T.C. 141, 145-46 (2001), aff'd, 54 F. App'x 100 (3d Cir. 2002); secs. 31.3121(a)-1(c), 31.3306(b)-1(c), Employment Tax Regs.

A big part of this analysis is what "reasonable compensation" for the employee's services would be.  See David E. Watson, P.C., 668 F.3d at 1016-17; Rev. Rul. 74-44, 1974-1 C.B. 287.  This is yet another question where caselaw has sprouted a profusion of possibly relevant facts:

- "the employee's qualifications;"

- "the nature, extent and scope of the employee's work;"

- "the size and complexities of the business;"

[*22] ● "a comparison of salaries paid with the gross income and the net income;"

● "the prevailing general economic conditions;"

● "comparison of salaries with distributions to stockholders;"

● "the prevailing rates of compensation for comparable positions in comparable concerns;"

● "the salary policy of the taxpayer as to all employees;" and

● "in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in the previous years."

Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151-52 (8th Cir. 1974), aff'g T.C. Memo. 1973-130; David E. Watson, P.C., 757 F. Supp. 2d at 889-90. In David E. Watson, P.C., for example, the Eighth Circuit accepted a District Court's application of those factors where the sole officer, shareholder, director, and employee of an S corporation paid himself $24,000 in salary and around $200,000 in distributions. 668 F.3d at 1012. There, the court found that the trial court didn't err when it accepted an IRS expert's opinion that "reasonable compensation" for the services of a highly qualified, experienced, full-time accountant such as the taxpayer was around $91,000. Id. at 1013, 1018.[11]

---

[11] Povolny argues that the parties' subjective intent alone determines whether payments were compensation. The Eighth Circuit does not agree. See

(continued...)

**[\*23]** The Commissioner estimated at trial that reasonable compensation for the CEO of a St. Paul construction company the size of PG is $213,000. He points out that while Povolny's 2011 W-2 from PG reports only $44,000 in salary, combining that with the contested payments results in $195,000, which is fairly close to the estimate. There's no reason for us to think that the Commissioner's estimate is unreasonable given Povolny's decades of real-estate development experience and the fact that he singlehandedly ran three companies, one of which had hundreds of thousands of dollars in receipts and one of which had an international contract.

Povolny didn't contest this estimate at trial or in his opening brief. He mentioned it only in his reply brief, where he argued that the Commissioner didn't affirmatively show that the estimate was the result of comparisons to companies sufficiently similar to PG. But it is Povolny's burden to show that the Commissioner's determination is wrong, not the Commissioner's burden to show that it is right. See Rule 142(a); Welch, 290 U.S. at 115. Povolny doesn't bear his burden here.

---

[11](...continued)
David E. Watson, P.C., 668 F.3d at 1018-19. Subjective intent controls only in the "rare case where there is evidence that an otherwise reasonable compensation payment contains a disguised dividend." Id. at 1019 (quoting Elliots, Inc. v. Commissioner, 716 F.2d 1241, 1244 (9th Cir. 1983), rev'g T.C. Memo. 1980-282). That's not the situation here.

[*24] And Povolny's own testimony undermined his position. When his attorney asked him whether the $77,000 payment was a distribution or compensation, Povolny replied: "Part of it was compensation * * * but the majority of it was intended to pay off debts." The only debt Povolny specifically mentioned, though, was a personal debt--the mortgage on his home. Povolny also testified that the $74,000 payment was a loan, but we've already shown that it wasn't, and it went directly to the payment of the other companies' debts.[12]

We find for the Commissioner on this issue.

## IV.   Employment Taxes

The next issue is whether PG owes employment taxes on the $77,000 and $74,000 it paid Povolny in 2011. "[A]n officer who performs substantial services for a corporation and who receives remuneration in any form for those services is considered an employee, whose wages are subject to Federal employment taxes." Veterinary Surgical Consultants, P.C., 117 T.C. at 145; see also sec. 3121(d)(1); sec. 31.3121(d)-1(b), Employment Tax Regs. An employer can avoid employment-tax liability by showing three things:

_____

[12] One of the payments was for $35,000 in settlement of a collections action by Wells Fargo. Povolny, PG, Archetone Limited, and Archetone International were all parties to the settlement.

**[\*25]** ● it didn't treat the person as an employee (essentially meaning it didn't file a W-2);

● it filed its tax returns consistent with that treatment; and

● it had a reasonable basis for not treating the person as an employee.

Revenue Act of 1978, Pub. L. No. 95-600, sec. 530(a), 92 Stat. at 2885.

Otherwise, the employer is liable.

The Commissioner points out that Povolny was an officer who performed substantial services for PG and received payment in return. And in 2011 PG both issued Povolny a W-2 and reported that compensation on its return. So far, so good for the Commissioner. Povolny, for his part, doesn't address the employment taxes on brief--he argues that the compensation at issue wasn't wages, but we've held that it was. The issue is therefore conceded. See Rule 34(b)(4); McNeil v. Commissioner, T.C. Memo. 2011-150, 2011 WL 2559802, at *1 n.3, aff'd, 451 F. App'x 622 (8th Cir. 2012).

V.    Penalties

The Commissioner says that PG owes section 6662(a) accuracy-related penalties for 2010 and that the Povolnys owe such penalties for 2010 and 2011. Section 6662 imposes a 20% penalty when there is an underpayment attributable to negligence, disregard for the rules or regulations, or "[a]ny substantial

[*26] understatement of income tax." Sec. 6662(a) and (b)(1) and (2). Povolny argues that these penalties shouldn't apply because a CPA prepared each of the returns at issue, which he says is enough to show reasonable cause and good faith. See sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.

A.     Penalties Against the Povolnys

The Commissioner has the initial burden of production regarding the penalties against the Povolnys because they are individuals. Sec. 7491(c) (Commissioner has burden of production "with respect to the liability of any individual for any penalty"). First he must show that the tax understatement was "substantial", which means it exceeded the greater of $5,000 or "10 percent of the tax required to be shown on the return." Sec. 6662(d)(1)(A). The Commissioner bore this part of his burden: Each year's understatement surpasses both $5,000 and 10% of the tax required to be shown on the return.

We recently noticed that section 7491(c) also places on the Commissioner the burden to show that accuracy-related penalties were "personally approved (in writing) by the immediate supervisor" of the IRS employee who made the initial determination to assert them in the notice of deficiency. Sec. 6751(b); Graev III, 149 T.C. at ___ (slip op. at 14). This the Commissioner failed to do. Accordingly, he did not meet his burden of production, and the Povolnys are not liable for the

[*27] penalty the Commissioner determined against them for 2010 or 2011. See

Ford v. Commissioner, T.C. Memo. 2018-8, at *6.

B.       Penalties Against PG

The Commissioner has no burden of production regarding the penalties

against PG because section 7491(c) doesn't apply to corporations. See NT, Inc. v.

Commissioner, 126 T.C. 191, 195 (2006).[13]  PG can avoid the penalties, however,

if it shows that it had reasonable cause to take its return positions and acted in

good faith.  Sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.  Povolny,

arguing against all of the penalties the Commissioner determined in these cases

(including those against the Povolnys as individuals, which we've already held we

can't sustain), says he made this showing because he hired a CPA to prepare both

PG's and the Povolnys' tax returns during the years at issue.

---

[13] We've occasionally applied section 7491(c) to C corporations. See D&R Fin. Servs. Inc. v. Commissioner, T.C. Memo. 2011-252, 2011 WL 5154107, at *5; McGehee Family Clinic, P.A. v. Commissioner, T.C. Memo. 2010-202, 2010 WL 3583386, at *5, aff'd, 777 F.3d 582 (2d Cir. 2015); Maint., Painting & Constr., Inc. v. Commissioner, T.C. Memo. 2003-270, 2003 WL 22137927, at *4. But NT, Inc. v. Commissioner, 126 T.C. 191 (2006), is a T.C. Opinion, so we must follow it.  We usually do.  See, e.g., Our Country Home Enters., Inc. v. Commissioner, 145 T.C. 1, 55 (2015); Shah v. Commissioner, T.C. Memo. 2015-31, at *44 n.72; HIE Holdings, Inc. v. Commissioner, T.C. Memo. 2009-130, 2009 WL 1586044, at *86 n.54, aff'd, 521 F. App'x 602 (9th Cir. 2013).

[*28] Reliance on an adviser can save a taxpayer from accuracy-related penalties, but only if the reliance was reasonable. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Reliance is reasonable if:

- the adviser was a competent professional with sufficient expertise to justify reliance;

- the taxpayer provided necessary and accurate information to the adviser; and

- the taxpayer actually relied on the adviser's judgment in good faith.

Id. at 99.

The Commissioner doesn't dispute that the CPA was a competent professional. But Povolny didn't give this CPA necessary and accurate information. He provided only the QuickBooks entries for the purported loans--he didn't provide any supporting documentation, because he never created any. Povolny also misled the CPA--specifically, he said that Archetone International didn't need to file returns because it had no revenue, even though it had received at least some payments for the Algerian hospital contract.

Povolny also didn't actually rely on the CPA's judgment. He never asked for the CPA's advice regarding how to report the contested transactions, and it

[*29] was Povolny--not the CPA--who decided that the purported bad debt became worthless in 2011. Rather than provide complete information and follow the CPA's advice, he simply told the CPA how to report everything. Merely hiring a CPA--without giving him necessary information or relying on his advice--doesn't protect a taxpayer. See, e.g., Bronson v. Commissioner, T.C. Memo. 2012-17, 2012 WL 129803, at *12-*13, aff'd, 591 F. App'x 625 (9th Cir. 2015); Kaplan v. Commissioner, T.C. Memo. 2006-16, 2006 WL 265878, at *23. PG is therefore liable for the penalties determined against it.

There were settlements and concessions on other issues, so

Decisions will be entered under

Rule 155.